**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ECI SOFTWARE SOLUTIONS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **JOHN PLYLER PLUMBING AND** | § | **CASE NO. 3:18-cv-02758-S** |
| **HARDWARE, INC.; OLSHAN LUMBER** | § | |
| **COMPANY; PROSPERITY COMPUTER** | § | |
| **SOLUTIONS, LLC; GREG MATATALL;** | § | |
| **WADE FRAZIER; AND ED BALDRIDGE;** | § | |
| | § | |
| **Defendants.** | § | |

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

Plaintiff ECI Software Solutions, Inc. ("ECI") hereby files its Second Amended Complaint as follows:

## I.    SUMMARY

1.    ECI brings this lawsuit to prevent the ongoing theft of its valuable software, misappropriation of its trade secrets, and infringement of its copyrights.  ECI is a leading software company that offers enterprise resource planning solutions to its customers.  In 2007, ECI acquired substantially all of the assets of Advantage Business Computer Systems, Ltd. ("ABC"), whose products were designed, developed, marketed, and licensed to businesses in the lumber and building materials, hardlines, building, and construction industries.  The primary asset that ECI acquired from ABC was a line of software known generally as "Advantage," which was designed, developed, and architected by the owner of ABC, Greg Matatall ("Matatall").  Following ECI's acquisition of the Advantage software from ABC, Matatall and most of the ABC staff (including

PLAINTIFF'S SECOND AMENDED COMPLAINT – Page 1

many of Matatall's friends and family members) came to work for ECI.  On February 4, 2015, ECI terminated Matatall's employment as part of a routine reduction in force.  Although ECI continued operating out of an office building owned by Matatall and located on his property, Matatall, angry at having been terminated by ECI, helped his son-in-law, Defendant Wade Frazier ("Frazier"), form Defendant Prosperity Computer Solutions, LLC ("Prosperity") to compete with and harm ECI.  Most, if not all, of Matatall's friends and family who had joined ECI after ECI's acquisition of the Advantage software left ECI to join Prosperity.  Among them was ECI employee Ed Baldridge ("Baldridge").[1]

2.     Defendants John Plyler Plumbing and Hardware, Inc. ("Plyler") and Olshan Lumber Company ("Olshan")[2] were longtime customers of ABC and Matatall, having purchased licenses to the Advantage software from Matatall himself long before ECI acquired the Advantage software from ABC in 2007.  Recently, however, both Plyler and Olshan terminated their relationships with ECI, terminated their licenses to continue using the Advantage software, and stopped paying their license fees to ECI.  Plyler and Olshan terminated their relationships with ECI to transition their systems to a competing product offered by Prosperity.  However, neither Plyler nor Olshan actually stopped using the Advantage software.  Instead, conspiring with the other Defendants, Plyler and Olshan improperly accessed and altered the license-expiration dates in the Advantage software in a manner that allowed them to continue using it—despite the fact they stopped paying ECI for the rights to use the Advantage software.  When ECI discovered this fact, it remotely reset the license-expiration dates so the Advantage software would turn "off" after a certain period of time by using a proprietary tool that permits ECI to regulate who can and cannot utilize the Advantage software based on their status as a licensee.

---

[1]     Prosperity, Matatall, Frazier, and Baldridge are referred to herein collectively as the "Prosperity Defendants."

[2]     Plyler, Olshan, Matatall, Frazier, Baldridge, and Prosperity are referred to herein collectively as "Defendants."

3.      Shortly after ECI reset the software to lock out Plyler and Olshan, Prosperity and its employees, using their knowledge of the trade secrets embodied in the Advantage software—knowledge that ECI paid tens of millions of dollars to acquire and which Prosperity and its employees promised to keep confidential—improperly accessed the Advantage software and used ECI's trade secrets to reset the expiration dates until the end of 2018, thereby allowing Plyler and Olshan to continue using the Advantage software without paying for it and providing Prosperity with the time necessary to transition Plyler and Olshan to its competing software solution.

4.      As set forth in detail below, the Defendants conspired to actively steal access to ECI's Advantage software by misappropriating and using ECI's trade secrets and by unlawfully circumventing ECI's digital protections of its software and infringing on ECI's copyrights.  These acts constitute violations of several federal statutes, breaches of multiple contracts, and torts under Texas law.  Given the ongoing nature of the statutory violations, the lack of an adequate remedy at law, and the irreparable nature of the injury, ECI sought a temporary restraining order and preliminary injunction.  The Court entered a temporary restraining order after the Parties agreed to its terms and requested its entry, and Plyler, Olshan, and Prosperity agreed to be bound by it.  Similarly, the Court entered an Agreed Preliminary Injunction after the Parties agreed to its terms and requested its entry, and Plyler, Olshan, and Prosperity agreed to be bound by it.  ECI now seeks a permanent injunction to prevent Defendants' ongoing unlawful conduct.

## II.    <u>PARTIES</u>

5.      ECI is a Delaware corporation with its principal place of business in Fort Worth, Texas.

6.      John Plyler Plumbing and Hardware, Inc. is an Arkansas corporation with its principal place of business in Glenwood, Arkansas.  The Court has personal jurisdiction over Plyler

because it expressly consented to personal jurisdiction in Texas and has minimum contacts with the State of Texas. Specifically, Plyler originally contracted with ECI in Texas to license the Advantage software and the contract contains choice of law and exclusive jurisdiction provisions under which Plyler expressly consented to jurisdiction in Texas. Plyler's contract with ECI was also performed in Texas and the software was updated, supported, maintained, and managed in Texas and Plyler continually communicated with ECI in Texas and sent license payments to ECI in Texas. Plyler likewise contracted with Prosperity in Texas for services to be performed in Texas, conspired with Prosperity in Texas to commit torts in Texas, targeted its wrongdoings towards Texas, and damaged ECI in Texas. Plyler has been served and appeared in this case.

7.      Olshan is a Texas corporation with its principal place of business in Texas. The Court has personal jurisdiction over Olshan because it expressly consented to personal jurisdiction in Texas, is at home in Texas, and has minimum contacts with the State of Texas. Specifically, Olshan is headquartered in Texas and subject to general jurisdiction in Texas. Moreover, Olshan originally contracted with ECI in Texas to license the Advantage software and the contract contains choice of law and exclusive jurisdiction provisions under which Olshan expressly consented to jurisdiction in Texas. Olshan's contract with ECI was also performed in Texas and the software was updated, supported, maintained, and managed in Texas and Olshan continually communicated with ECI in Texas and sent license payments to ECI in Texas. Olshan likewise contracted with Prosperity in Texas for services to be performed in Texas, conspired with Prosperity in Texas to commit torts in Texas, targeted its wrongdoings towards Texas, and damaged ECI in Texas. Olshan has been served and appeared in this case.

8.      Prosperity is a Texas limited liability company with its principal place of business in Texas and, upon information and belief, one or more of its members are citizens of the State of

Texas.  The Court has personal jurisdiction over Prosperity because it is at home in Texas and has minimum contacts with the State of Texas.  Specifically, Prosperity is headquartered in Texas and subject to general jurisdiction in Texas.  Moreover, Prosperity contracted with Texas parties, performed services in Texas, conspired with Plyler and Olshan in Texas to commit torts in Texas, targeted its wrongdoings towards Texas, and damaged ECI in Texas.  Prosperity has been served and appeared in this case.

9.     Greg Matatall is an individual and citizen of the State of Texas who lives at 515 Private Road 3001, Big Sandy, Texas 75755 or nearby. He may be served at his residence, his place of work located at 605 Private Road 3001, Big Sandy, Texas 75755, or wherever he may be found.  The Court has personal jurisdiction over Matatall because he is at home in Texas and has minimum contacts with the State of Texas.  Specifically, Matatall is a citizen of Texas and resides in Texas and subject to general jurisdiction in Texas.  Moreover, Matatall performed services in Texas, conspired with Plyler and Olshan in Texas to commit torts in Texas, targeted his wrongdoings towards Texas, and damaged ECI in Texas.

10.     Wade Frazier is an individual and citizen of the State of Texas who lives at 12867 Winding Oak, Lindale, Texas 75771 or nearby.  He may be served at his residence, his place of work located at 605 Private Road 3001, Big Sandy, Texas 75755, or wherever he may be found. The Court has personal jurisdiction over Frazier because he is at home in Texas and has minimum contacts with the State of Texas.  Specifically, Frazier is a citizen of Texas and resides in Texas and subject to general jurisdiction in Texas.  Moreover, Frazier performed services in Texas, conspired with Plyler and Olshan in Texas to commit torts in Texas, targeted his wrongdoings towards Texas, and damaged ECI in Texas.

11.     Ed Baldridge is an individual and citizen of the State of Texas who lives at 9395 State Highway 155 South, Big Sandy, Texas 75755 or nearby.  He may be served at his residence, his place of work located at 605 Private Road 3001, Big Sandy, Texas 75755, or wherever he may be found.  The Court has personal jurisdiction over Baldridge because he is at home in Texas and has minimum contacts with the State of Texas.  Specifically, Baldridge is a citizen of Texas and resides in Texas and subject to general jurisdiction in Texas.  Moreover, Baldridge performed services in Texas, conspired with Plyler and Olshan in Texas to commit torts in Texas, targeted his wrongdoings towards Texas, and damaged ECI in Texas.

### III.    JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. Specifically, ECI brings this suit under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), the Digital Millennium Copyright Act, 17 U.S.C. § 1203 ("DMCA"), and the Copyright Act of 1976, 17 U.S.C. § 501 et seq. ("Copyright Act").  The Court has supplemental jurisdiction over ECI's state law claims under 28 U.S.C. § 1367(a).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).  Plyler and Olshan reside in the Northern District of Texas and all the defendants reside in Texas as residency is defined in 28 U.S.C. § 1391(c) & (d).  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).  Significant ECI infrastructure and operations are located at ECI's offices in Fort Worth including the AMP Server discussed below.  ECI stores many of the trade secrets addressed below at its offices in Fort Worth, and Defendants' actions have repeatedly harmed ECI in Fort Worth.

## IV.    FACTUAL BACKGROUND

A.    **ECI and the Advantage software**

14.    ECI is a leading software company that offers enterprise resource planning solutions to its customers.  In 2007, pursuant to an asset purchase agreement (the "APA"), an ECI affiliate, Advantage Business Computer Systems, Inc., purchased substantially all of the assets of Advantage Business Computer Systems, Ltd., a software partnership located in Big Sandy, Texas, and Versyss Data Systems, LLC ("Versyss"), a Texas limited liability company, (collectively ABC and Versyss are referred to as the "Sellers").  ECI also purchased related assets of certain of ABC's affiliates.  ABC marketed products under the brand name "Advantage," which were designed, developed, and licensed to businesses in the lumber and building materials, hardlines, building, and construction industries.

15.    ABC's partners, Advantage Business Computer Systems GP, LLC, Gregory Matatall, Janet Matatall, Vickie Frazier, Abbey Matatall, Scott W. Stanford, and Gregory D. Cuke were also parties to the APA, and the APA defined them as "Partners" (ABC and Versyss along with the Partners are referred to herein as the "ABC Parties").

16.    Among other things, ECI's purchase of the Sellers' assets included all of their "Intellectual Property and Intellectual Property Rights and related goodwill," including all Intellectual Property, Intellectual Property Rights, and related goodwill associated with the Advantage software.  Section 1 of the APA provides in relevant part:

1.1     Sale of Assets.  Each of the Partners and Sellers shall cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, at the Closing (as defined below), good and valid title to the Assets (as defined below), free of any Encumbrances except the Permitted Encumbrances, on the terms and subject to the conditions set forth in this Agreement.  For purposes of this Agreement, "Assets" shall mean and include:  (a) all of the properties, rights, interests and other tangible and intangible assets of each of the Sellers (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with the Historical Accounting Method); and (b) any other assets that are owned by any of the Partners or any other Related Party and that are necessary and used for the conduct of the business of each of the Sellers; provided, however, that the Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Assets shall include the following (except to the extent the following descriptions would encompass an Excluded Asset):

. . .

(5)     all Intellectual Property and Intellectual Property Rights and related goodwill of each of the Sellers (including without limitation the right to use the name "Advantage Business Computer Systems", "Versyss" and variations thereof, and the Intellectual Property and Intellectual Property Rights identified in Part 2.13 of the Disclosure Schedule);

17.     Importantly, under Section 2 of the APA, each of the ABC Parties made several representations and warranties.  Section 2 provides in relevant part:

2.     Representations and Warranties of the Partners and the Sellers.

The Partners and the Sellers, jointly and severally, represent and warrant, to and for the benefit of the Purchaser, the following as of the date hereof and as of the Closing Date.  All references to Sellers in this Section shall refer to them jointly and severally.

. . . .

2.13     Intellectual Property; Privacy.

. . . .

(g)     Ownership Free and Clear.  Sellers (singularly or jointly) exclusively own all right, title, and interest to the Sellers' IP (other than Intellectual Property Rights exclusively licensed to any of the Sellers and the Intellectual Property Rights non-exclusively licensed to any of the Sellers, as identified in Part 2.13(c) of the Disclosure Schedule) free and clear of any Encumbrances (other than licenses and rights granted pursuant to the Contracts identified in Part 2.13(d) of the Disclosure Schedule).  Without limiting the generality of the foregoing:

. . . .

(iv)    Protection of Proprietary Information.   Each of the Sellers has taken all reasonable steps, through limited license grants and confidentiality agreements with customers, to maintain the confidentiality of and otherwise protect and enforce their rights in the

Intellectual Property pertaining to each of the Seller's Product.  Without limiting the generality of the foregoing, except as identified in Part 2.13(n) of the Disclosure Schedule, no portion of the source code for any software ever owned or developed by the Sellers has been disclosed or licensed to any escrow agent or other Person.

(v)    Past IP Dispositions.   None of the Sellers has assigned or otherwise transferred ownership of, or agreed to assign or otherwise transfer ownership of, any Intellectual Property Right in Sellers' IP to any other Person.

18.    As seen above, Section 2.13(g)(iv) references an exception set forth in the Part 2.13(n) of the Disclosure Schedule.  That Part states in full:

**PART 2.13(n) – SOURCE CODE**

Seller has provided source code relating to Seller's Software to its Customers under a limited license and subject to confidentiality provisions (see Sample license attached hereto as **Attachment 2.13(f) #1**).

19.    Crucially, the "Sample license" attached to the APA provides a limited, non-perpetual license of the source code to the licensee.

20.    On or about December 31, 2014, Advantage Business Computer Systems, Inc. merged into "eCommerce Industries, Inc."  On or about January 5, 2015, "eCommerce Industries, Inc." changed its name to ECI Software Solutions, Inc.  Thus, ECI owns the Advantage software and all of the intellectual property rights embodied therein.  Indeed, ECI is the exclusive owner and licensor of the Advantage software.

21.    The Advantage software is an original work of authorship fixed in a tangible medium of expression from which it can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  The Advantage software constitutes copyrighted subject matter under the laws of the United States as evidenced by the attached Certificates of Registration.  ECI owns valid copyrights in the Advantage software and related

products as evidenced by the attached Certificates of Registration. ECI is the sole proprietor of all right, title, and interest in and to the copyrights to the Advantage software. ECI has complied with all the provisions of the copyright laws of the United States applicable to the Advantage software. On February 6, 2019, ECI filed applications to register copyrights for three versions of its Advantage software and paid the related fees. Specifically, ECI filed applications to register a version of the Advantage software that was created and published in 2007, a version that was created and published in 2014, and a version that was created and published in 2018. Advantage Business Computer Systems, Inc. authored the 2007 and 2014 versions of the Advantage software and later merged into eCommerce Industries, Inc. As explained above, eCommerce Industries, Inc. is ECI. ECI authored the 2018 version of the Advantage software. After ECI filed its applications, the United States Copyright Office registered ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for the three versions of the Advantage software that ECI sought to register.

22.     Pursuant to the APA, ECI acquired any and all rights and interests in and to the Advantage software held by the ABC Parties. ECI expressly required the ABC Parties to assign any and all of their associated rights and interests in and to the Seller's intellectual property to ECI including, but not limited to, any and all copyrights and trade secrets embodied in the Advantage software. ECI has been forced to bring litigation in the past to secure additional agreements to maintain the integrity of its trade secrets, including, but not limited to, agreements providing express representations and warranties that certain entities and individuals would not use ECI's trade secrets or access the Advantage software.

23.     Since purchasing the Advantage software from the ABC Parties, ECI has continued to develop, augment, and otherwise improve the Advantage software. All such improvements

were made by ECI employees within the scope of their employment with ECI.  Therefore, ECI is considered the original author of such improvements.

24.     For the avoidance of any doubt, all persons who performed work in the Advantage software since it was acquired from the ABC Parties have also assigned any and all rights and interests in and to the Advantage software to ECI and have confirmed such assignments in writing.

25.     ECI licenses the Advantage software to customers located in various states throughout the country and in various countries around the world but only on a non-exclusive basis.  ECI strictly controls access to its products with such non-exclusive licenses.  ECI has not alienated any of its copyrights in and to the Advantage software or any of the trade secrets that it seeks to protect in this suit.

26.     ECI's customers license the Advantage software pursuant to written agreements and are required to pay ECI a monthly fee under those agreements for the right to use the Advantage software and receive ongoing support and maintenance ("ECI Support").

27.     Such contracts with ECI are the only means by which ECI's customers obtain the right to use and receive periodic updated releases of the Advantage software, which may incorporate, among other things, additional features and alterations or enhancements of a similar nature ("ECI Updates").

28.      Such contracts with ECI are the only means by which ECI's customers obtain access to the programmers able to examine and modify proprietary, confidential, and trade secret information, including, but not limited to, the compiled code of the Advantage software, to resolve issues or problems that may arise during a customer's use or operation of the system.

29.     All ECI Support and ECI Updates are exclusively owned by ECI.  All programmers or other individuals providing ECI Support or ECI Updates do so within the scope of their

employment with ECI.  For the avoidance of any doubt, all such persons also assign any and all rights and interests in and to the ECI Support and ECI Updates to ECI and confirm such assignments in writing.

30.     Thus, ECI has the exclusive right to provide ECI Updates and/or ECI Support to any user of the Advantage software.

31.     ECI's license management system is twofold.  First, ECI has an Asset Management Patch Server (the "AMP Server") in Fort Worth, Texas that contains a record of the expiration dates of the various software licenses issued to ECI's customers.  Second, the Advantage software installed on a customer's server contains the expiration date of the customer's license in the license expiration file ("License Expiration File").  When a new customer purchases a license or an existing customer renews a license, ECI uses the AMP Server to send a proprietary and secret code, or a series of executable commands, (the "AMP Code") to the customer's server that sets the proper expiration date in the License Expiration File.  Approximately thirty (30) days prior to the date set forth in the License Expiration File, the customer receives an alert that its license to use the Advantage software will expire on the date noted.  If the customer wishes to renew its license, it must contact ECI to pay the applicable renewal fee and then receive an extension of the license for the applicable period.  ECI then uses the AMP Code to extend the date set in the customer's License Expiration File (which will make the expiration alert disappear until the next expiration date approaches).  On the date listed in the License Expiration File, the Advantage software becomes restricted.  When this happens, the customer may still access its historical data, but it cannot use the Advantage software to process new point-of-sale transactions.

32.     The AMP Code is an extremely valuable trade secret of ECI because it controls access to the Advantage software.  ECI takes significant measures to maintain the secrecy of the

AMP Code and the other trade secrets embodied in and associated with the Advantage software by, among other things, requiring employees to sign confidentiality and non-disclosure agreements; restricting access to the AMP Code; requiring password login to access the AMP Code; designing the Advantage software in a way that requires knowledge of a proprietary and confidential programing language to use the AMP Code and conduct other key activities within the Advantage software; requiring terminated employees to return all ECI property and be removed from ECI's security systems; assigning usernames and passwords for all computer users and requiring passwords to be at least seven characters, including an uppercase letter, lowercase letter, and number; prohibiting computer access after a certain number of failed attempts; using Windows "Active Directory Groups" to control access to various network drives and requiring all changes to an employee's user access be approve by an IT administrator; and maintaining an acceptable use policy relating to computer, internet, and email usage.

33.     By keeping the AMP Code secret, ECI ensures that only ECI can update the License Expiration Files.  If the AMP Code were revealed, ECI would be powerless to stop businesses from stealing the Advantage software by using the AMP Code to change their License Expiration Files without purchasing and paying for a license from ECI.

34.     Moreover, the Advantage software is further protected because conducting certain activities in the Advantage software requires logging into the superuser account that has access to all functions and files on the server with the superuser login (the "Superuser Login"), or, in certain limited circumstances logging into a customer-specific account created by ECI with similar functionality to the superuser account.  The password for the Superuser Login is kept under ECI's control and only known to a limited number of key ECI employees.  Additionally, the Advantage software runs on a Linux operating system, which maintains command history logs that capture

information regarding which users log into the systems running the Advantage software and the commands each user runs on those systems.  By reviewing the command history logs, ECI is able to detect illicit activities on its customers' systems.

**B.**     **Matatall and Frazier Form Prosperity, and ECI's Prior Litigation With Prosperity**

35.     Prosperity is an ECI competitor that was—and, upon information and belief, remains—financially supported by Matatall.  Matatall was the primary software developer of the Advantage software and owner of ABC.  Following ECI's acquisition of ABC's assets, Matatall came to work for ECI.  Matatall also owned the building out of which ABC operated, which is some 200 yards from Matatall's house.  From 2007 until 2016, ECI leased that building from Matatall and conducted Advantage software related business out of it.  In short, Matatall was both ECI's employee and its landlord.

36.     Frazier, who is Matatall's son-in-law, was also an ABC employee who came to work for ECI.  In 2012, Frazier resigned from ECI, citing an inability to deal with the pressures of the job.  From 2012 to 2015, Frazier spent his time working in a CrossFit gym.

37.     On February 4, 2015, ECI terminated Matatall's employment as part of a reduction in force, which upset Matatall.  He was ABC's founder and had always viewed the Advantage software as "his" software, notwithstanding the fact that ECI paid a considerable amount of money for it.  Matatall, flush with cash that ECI paid for the Advantage software, and angry that his employment with ECI had been terminated, hatched a plan to get back at ECI: he would use ECI's trade secrets to create a copycat software business, undercut ECI, and undermine its customer relationships.

38.     On October 29, 2015, Matatall's wife filed papers with the Texas Secretary of State forming Prosperity.  Prosperity's filing lists Frazier as its manager and sole owner, though Frazier

has described Matatall's role at Prosperity as "father-in-law, consultant, and advisor."  Matatall is also Prosperity's landlord: Prosperity originally operated out of Matatall's house and, upon information and belief, now operates out of the same building on Matatall's property that ECI previously leased from Matatall and has now vacated.

39.     From the outset, Matatall and Frazier designed Prosperity as a shell to house information they intended to misappropriate from ECI.  Their first step was to set up a business model identical to ECI's, with three primary business areas: selling software, servicing customers who buy that software, and selling hardware and other aftermarket items to those customers.  Because the Prosperity, Matatall, and Frazier needed ECI's trade secrets to duplicate ECI's success, they lured away multiple ECI employees who possessed that information.  Prosperity, Matatall, and Frazier recruited and hired Ed Baldridge.  The Prosperity Defendants would also ultimately recruit and hire David Houser (Matatall's nephew), Wade Ellison, and David Blackstone, all of whom were longtime ECI employees who had unfettered access to ECI's trade secrets and an intimate knowledge of ECI's business and proprietary methodologies.  Moreover, Ed Baldridge, David Houser, Wade Ellison, and David Blackstone each signed non-disclosure agreements as part of their employment with ECI, which prohibited them from disclosing ECI's trade secrets.

40.     It seems that the Prosperity Defendants and the employees they initially recruited did not know, or could not recall, enough of ECI's trade secrets to make Prosperity successful, so the Prosperity Defendants went to the source, ECI, for more trade secrets.

41.     Prosperity needed a customer base to which it could sell its copycat software.  That was the point of hiring Houser, a former ECI sales manager, who had unfettered access to ECI's strategies, customer lists, prospect lists, and sales information, among other confidential

information.  One of Prosperity's first efforts to misappropriate ECI's trade secrets was carried out

by Houser remotely.  In March 2016, Houser informed ECI that he was retiring and gave his two-

weeks' notice.  At the time, ECI had no reason to doubt Houser and continued to allow Houser

access to ECI's trade secrets.  Unbeknownst to ECI, however, Houser was in contact with

Prosperity and accepted employment at Prosperity without informing ECI.  Since ECI was

operating on Houser's representation that he was retiring—rather than going to work for a direct

competitor—ECI allowed Houser to keep the ECI laptop and cell phone ECI provided to Houser

for a short transition period, rather than demanding their immediate return.

42.     In the two-week period between Houser's departure from ECI and his return of

ECI's laptop and cell phone, Houser accessed ECI's proprietary customer relationship

management system containing ECI's trade secrets and, upon information and belief, copied ECI's

trade secret information to at least one flash drive.  Specifically, on March 17, 2016, two days after

he left ECI, Houser remotely accessed ECI's customer relationship management system.  Once in

the system, Houser had unfettered access to all manner of ECI's trade secrets, including, but not

limited to, information related to ECI's customers, prospects, pricing, products, margins, profit

percentages, credit profiles, preferences, and markets.  That information is created using

proprietary ECI methodologies.  ECI's customer relationship management system allowed Houser

to access and produce reports containing and/or analyzing this customer information, as well as

derivative information such as buying patterns, customer needs and preferences, and marketing

and pricing strategies for customers.  On information and belief, he did exactly that, and then

provided ECI's trade secret information to the Prosperity Defendants to use in furtherance of their

scheme.  Relatedly, though his last day at ECI was March 15, 2016, Houser kept the ECI laptop

until March 30, 2016.  Forensic examination of the ECI laptop shows that Houser linked at least

one flash drive to it immediately prior to returning the laptop to ECI and, on information and belief, downloaded ECI's trade secrets, including customer lists, prospect lists, and sales information from the ECI laptop to the flash drive. (All of the confidential information accessed and copied by Houser in March 2016 is referred to as the "ECI Laptop Data").

43.     Prosperity also hired Blackstone, a former ECI software developer, and Ellison, a former ECI software support specialist, directly from ECI to copy ECI's Advantage software and obtain and use ECI's trade secrets, which they learned while working for ECI.

44.     In March 2016, Ellison announced that he was leaving ECI but refused to tell ECI where he was going to work—only that he found a position as a QA analyst and would be able to work from home. Unbeknownst to ECI, however, Ellison, like Houser, was in contact with Prosperity and accepted employment at Prosperity without informing ECI. On or about March 22, 2016, prior to his departure from ECI, Ellison sent multiple emails containing ECI's trade secrets to one of his personal email addresses including, but not limited to, the structure for the implementation of a support tool for the Advantage software and documents related to the Advantage software general ledger (collectively, the "Email Data").

45.     With Houser, Blackstone, and Ellison on the payroll, the Prosperity Defendants were well on their way to copying, marketing, and selling their copycat software. The Prosperity Defendants then went to great lengths to convince the public that Prosperity was ECI: they used ECI's address for Prosperity's registered address and had Prosperity's mail (including hardware and equipment purchases) delivered to ECI's office. As described below, the Prosperity Defendants also sent out false and misleading marketing materials designed to deceive ECI's customers and prospects.

46.     The Prosperity Defendants' efforts to present Prosperity as ECI is hardly surprising since Frazier admitted that nearly 100% of Prosperity's sales are to ECI customers.

47.     Despite Houser's and Ellison's efforts, the Prosperity Defendants wanted more.  On June 9, 2016, upon information and belief, the Prosperity Defendants, or someone working at their direction, physically entered ECI's office, to which Matatall had access by virtue of the fact that he was ECI's landlord.  ECI found what appears to be Matatall's laptop connected to ECI's network, sitting on a service cart in a back room.  The only plausible reason for Matatall to connect his computer to ECI's network is to acquire information on ECI's system.

48.     The Prosperity Defendants apparently decided that what they really needed to create their copycat software was ECI's source code.  Over the July 4, 2016 weekend, a hard drive containing code from the Advantage software including, but not limited to, the boot information necessary to launch the development code for ECI's Advantage system and containing the most recent version of a development copy of the Advantage software source code was stolen from ECI's Big Sandy office, to which Matatall had access (the information on the stolen hard drive is referred to herein as the "Stolen Drive Information").  The circumstances surrounding the theft strongly indicate that the Prosperity Defendants, or someone acting on their behalf or for their benefit, were responsible for it.  Specifically, from the numerous and other highly valuable technology components located in ECI's office, the same office of which Matatall was the landlord, the thief targeted only the particular computer and hard drive containing the Stolen Drive Information.  That computer is indistinguishable from the others, meaning that the thief knew exactly what he wanted and where to find it.  Also missing were certain customer files containing specific and proprietary information relating to certain customers including descriptions of

customer-specific modifications to the Advantage software (the "Customer Files").  There were

no signs of forced entry, and nothing else was taken in the theft.

49.     Further, while the general public has no use for the Stolen Drive Information, the

Customer Files, or a development copy of the Advantage software source code, the Prosperity

Defendants have at least three uses.  First, access to the most recent version of a development copy

of the Advantage source code enabled the Prosperity Defendants to carry out their scheme, as

described below, to provide free maintenance and support to ECI's customers in an attempt to

persuade ECI's customers to breach their contracts with ECI and use Prosperity instead.

50.     Second, the Advantage software source code is customer-specific, with different

customers having different, customized levels and combinations of functionality.  The Prosperity

Defendants needed to know with specificity which software product and functionality ECI

provides to each of its customers so that they could duplicate this functionality in a competing

software product and service ECI's customers with the same customization, levels, and

combinations of functionality previously provided to the customers under license by ECI.

51.     Third, on information and belief, the Prosperity Defendants copied ECI's source

code to create their copycat software product.  The fact that Prosperity's copycat product is written

in a different software language does not mean that the Prosperity Defendants did not copy ECI's

source code or that Prosperity's copycat product is not a derivative work based on ECI's source

code.  On information and belief, the Prosperity Defendants obtained access to ECI's source code

on or before the weekend of July Fourth, 2016.

52.     Tellingly, shortly after the theft of the Stolen Drive Information and Customer

Files, Matatall sent an unsolicited email to ECI saying that he had "heard" about the theft of ECI's

hard drive and wanted ECI to know that he had "NEVER DONE ANYTHING CRIMINAL."

Because ECI did not publicize the theft, ECI realized that there was no way Matatall would have known about the theft unless he was involved in it or in communication with someone who was. When ECI asked Matatall how he learned about the theft, Matatall responded: "my wife told me she saw the police car." Of course, seeing a police car parked outside a building does not give rise to the knowledge that someone has stolen a computer hard drive from that building. The inescapable conclusion is that the Prosperity Defendants carried out or, at a minimum, were involved in the theft of the Stolen Drive Information and Customer Files.

53.     The Prosperity Defendants' attempts to lure away ECI's customers were not limited to using trade secrets obtained from ECI. They also actively interfered with ECI's customer relationships. Specifically, Matatall solicited and offered to do free service work for any ECI customer, sending instant messages framed with: "CALL ANYTIME FOR SOFTWARE AND HARDWARE SUPPORT – NO CHARGE IF YOU ARE PAYING ECI MAINTENANCE." These instant messages were obviously designed to incentivize ECI's customers to breach their contracts with ECI and enter into new ones with Prosperity. The fact that Matatall did not even seek compensation for his services demonstrates the malice that attends his actions: he preferred to spend his time sitting in his bedroom office doing free work for ECI's customers than spending his considerable fortune. Upon information and belief, Matatall and the other Prosperity Defendants would not have been unable to offer such support services without the unauthorized use of ECI's trade secrets.

54.     On information and belief, in the course of providing such unauthorized support services to ECI's customers, the Prosperity Defendants have illicitly acquired, copied, installed, accessed, and run the Advantage software and/or ECI Updates on their systems.

55.     Additionally, upon information and belief, the Prosperity Defendants have provided unauthorized support services, including, but not limited to ECI Updates, to former ECI customers whose support contracts with ECI have been terminated and are no longer licensed to receive ECI Updates.

56.     The Prosperity Defendants also sent blast emails designed to interfere with ECI's customer relationships.  The emails, directed at ECI's customers, advertised that Prosperity was operating "the business model adopted when Advantage Business Computer Systems was created."  Even worse, the subject line of those emails proclaimed: "New Company Name. Same Familiar Faces."  Plainly, the "same familiar faces" are the ECI employees the Prosperity Defendants wrongfully lured away.  Indeed, Houser testified that, to his customers, he was "the face of ECI."

57.     Importantly, Frazier used ECI's trade secrets to create the mailing list for his blast emails: he has admitted that some 90% of the people to whom he sent his "same familiar faces" email were ECI customers, whom he knew by virtue of his employment at ECI.  Further to that end, Houser admitted that he has been working with Frazier to develop marketing strategies directly targeted at ECI's customers.

58.     In 2016, ECI sued Prosperity for, among other things, misappropriation of ECI's trade secrets.  That litigation, along with a series of related lawsuits and/or arbitration proceedings, was settled.  As part of their settlement agreement with ECI, Prosperity, Matatall, and Frazier each agreed, among other things, not to use ECI's trade secrets and not to access, directly or indirectly, any software of ECI or ECI's affiliates.  Until recently, ECI believed that Prosperity, Matatall, and Frazier were abiding by the terms of the settlement agreement, but it now appears clear that they

were not and that instead of complying with the settlement agreement, Prosperity, Matatall, and Frazier have breached the settlement agreement.

**C.**   **ECI's agreements with Plyler and Olshan**

59.   ABC began licensing the Advantage software to Olshan in 1999 and to Plyler in 2000.   After ECI purchased the Advantage software from ABC in 2007, Plyler and Olshan continued to renew their licenses to the Advantage software from ECI and pay ECI the applicable fees therefor.   In addition to licensing the Advantage software, Olshan and Plyler also regularly backed up their data to ECI's servers in Texas.   Plyler's and Olshan's servers contained local copies of the Advantage software.

60.   At various times, Plyler and Olshan accepted updates for the Advantage software. In order to receive these updates, Plyler and Olshan each agreed to the terms of an End User License Agreement (a "EULA") in which they each agreed, among other things, to not "adapt, alter, modify, translate or create derivative works of the Software[,]"  "allow any third party to access or use the Software for any reason[,]" and, upon termination, to "immediately cease using the Software and return all of the copies of the Software to [ECI], certify to [ECI] that [it] ha[s] retained no copies of the Software, and acknowledge that [it] may no longer use the Software."

61.   Olshan was using the Advantage software pursuant to the EULA described above. On December 31, 2016, Olshan notified ECI that it was terminating its licenses in 60 days.   The EULA provided that Olshan's license would automatically terminate upon the occurrence of certain events including disclosing the Advantage software to unauthorized third parties, attempting to use, copy, license, or convey the Advantage software contrary to the terms of the agreement or in derogation of ECI's rights in the Advantage software, or failing to pay as required by the agreement.   Therefore, Olshan's license to use the Advantage software terminated, at the

latest, on March 1, 2017.  Since February 28, 2017, Olshan has not paid ECI any license fees to use the Advantage software.

62.     Plyler was using the Advantage software pursuant to the EULA described above. The EULA provided that ECI could terminate the license agreement if Plyler failed to pay the license and maintenance fees.  On January 9, 2018, ECI sent written notice to Plyler that its December 1, 2017 and January 1, 2018 invoices were due and encouraged Plyler to email or call if there were any issues.  On February 12, 2018, ECI sent written notice to Plyler that it had three invoices past due and asked Plyler to contact ECI promptly about the past-due balance to avoid interruption in Plyler's support or access to the Advantage software.  On March 6, 2018, ECI sent written notice to Plyler that it had four invoices past due and asked Plyler to contact ECI promptly about the past-due balance to avoid interruption in Plyler's support or access to the Advantage software.  On March 23, 2018, ECI sent written notice to Plyler that Plyler had four invoices past due and was pending cancellation for nonpayment.  On May 25, 2018, owing to Plyler's failure to pay the license and maintenance fee, ECI sent written notice to Plyler that Plyler had six invoices past-due and that ECI would terminate Plyler's account in two business days if Plyler did not contact ECI.  The same day Plyler called ECI stating that Plyler was no longer using the Advantage software and refusing to pay its outstanding balance.  Therefore, Plyler's license to use the Advantage software terminated, at the latest, on May 25, 2018.  Since May 25, 2018, Plyler has not paid ECI any license fees to use the Advantage software.

63.     Moreover, both Plyler and Olshan have engaged in conduct with respect to the Advantage software that was outside the scope of license agreements with ECI.  The conduct includes, but is not limited to, permitting third parties to access the Advantage software on their servers.

64.     Typically, when a customer notifies ECI that it is terminating its license, ECI changes the License Expiration Files in the customer's server to the customer's paid-through date. ECI often accomplishes this change by using the AMP Code to update the License Expiration Files the next time the customer's server connects to ECI's system for a software update or by manually connecting to the customer's server and using the AMP Code to change the License Expiration Files.

65.     After Plyler and Olshan notified ECI that they were terminating their licenses, through no action on the part of ECI, their servers ceased connecting with ECI's system to receive updates of the Advantage software.   Furthermore, someone other than ECI removed ECI's credentials from Plyler's and Olshan's firewalls, which prevented ECI from accessing Plyler's and Olshan's systems directly to update the License Expiration Files.   This situation was not particularly alarming to ECI, however, because, under the terms of their EULAs with ECI, Plyler and Olshan were required to stop using the Advantage software upon termination.   ECI did not have a reason to reasonably suspect that Plyler or Olshan would continue using the Advantage software post-termination.

**D.     ECI discovers the theft of its trade secrets and circumvention of its technological measures that effectively control access to its copyrighted software.**

66.     In July 2018, during a routine review of backup logs of its customers' servers, ECI discovered that Plyler's and Olshan's servers were still backing up to ECI's system in Texas. Further investigation revealed that Plyler and Olshan were still using the Advantage software even though they did not have authorized licenses.   The backup logs included point of sale transactions that Plyler and Olshan conducted on July 11 and 12, 2018, respectively, using the Advantage software.

67.     As part of its investigation, ECI reviewed the License Expiration Files in the backup logs maintained on its server.  Plyler's License Expiration File had a March 1, 2018 timestamp on it and an encoded entry that translates to an expiration date of March 23, 2019.  Olshan's License Expiration File had a June 5, 2018 timestamp and an encoded entry that translates to an expiration date of August 31, 2018.  ECI had no record of those being changed by any ECI employee.  In contrast, ECI's AMP Server, showed license expiration dates for Plyler and Olshan that were consistent with the dates that Plyler and Olshan cancelled their agreements with ECI.  In other words, someone other than ECI accessed the License Expiration Files in Plyler's and Olshan's Advantage software and extended the expiration dates so that Plyler and Olshan could continue using the Advantage software without paying for it, notwithstanding that they had terminated their license agreements with ECI with effect in May 2018 and March 2017, respectively.

68.     In order to maintain the integrity of its software and protect the value of its intellectual property, ECI's EULAs with Plyler and Olshan permit ECI to remotely modify the Advantage software, including the License Expiration Files.  But, updating the License Expiration Files in July 2018 to have expiration dates that matched Plyler's and Olshan's cancellation dates would have caused the Advantage software to start functioning in a restricted mode immediately. Therefore, on July 24, 2018, ECI sent updated License Expiration Files to Plyler's and Olshan's servers with an encoded entry that translated to an expiration date of July 31, 2018—or seven days later.  ECI sent the updated License Expiration Files to trigger countdown messages on Plyler's and Olshan's systems stating that their Advantage software licenses would expire in seven days under the assumption that Plyler and Olshan would contact ECI to discuss their continued use of the Advantage software.  However, neither Plyler nor Olshan contacted ECI about renewing their licenses.

69.     On July 25, 2018, ECI reviewed its backup logs from Plyler's and Olshan's Advantage software and discovered that an unauthorized third party had again modified the License Expiration Files.  Specifically, the logs indicated that on July 24, 2018, at 3:47 p.m., within minutes of being reset by ECI to start the seven-day countdown to expiration, an unauthorized third party modified Olshan's License Expiration File with an encoded entry that translates to December 31, 2018.  Likewise, the logs indicated that a few hours later, at 6:21 p.m. on July 24, 2018, an unauthorized third party modified Plyler's License Expiration File with an encoded entry that translates to December 31, 2018.  Stated differently, an unauthorized third party improperly accessed the Advantage software on Plyler's and Olshan's servers to edit the coding so that the Advantage software, which at the time was unlicensed and for which no licensing fees were being paid, would not convert to a restricted mode until the end of the year.

70.     The internet uses a series of what are called DNS (Domain Name System) servers to correlate an internet protocol address ("IP address") to a domain name.  These can be private or public.  When an entry exists that correlates to a given IP address in either a public or private DNS server, Linux will store a portion of the user's name associated with the IP address where the access occurred in a log file.  ECI reviewed the access log files to see if anyone had accessed the servers at the times the License Expiration Files were altered.  Once ECI found indications that the servers were accessed by an unauthorized third party, ECI re-ran the scan to only show those entries.  The relevant login files from Plyler and Olshan both showed that a user identified as "prosperitycomput" logged into Plyler's and Olshan's servers at the exact times the License Expiration Files were altered.  Both times, the user logged in with the system login name of "root." This is the Superuser Login, which has access to all functions and files on the server.  The command history logs for both sessions for the user "root" reveal that the last set of commands

run on each system by the user "root" executed the AMP Code to access and reset the License Expiration Files during those sessions.

71.     After ECI's review of the backup logs from Plyler's and Olshan's servers revealed that a user identified as "prosperitycomput" was changing the License Expiration Files in the Advantage software, ECI reviewed the backup logs to obtain the IP address associated with that user.  ECI ran a program to trace that IP address, which indicated the IP address was associated with the domain name "prosperitycomputers.com."

72.     The user identified as "prosperitycomput" is Defendant Prosperity and can be traced to an IP address assigned to a computer owned or otherwise controlled by Prosperity. Prosperity subsequently admitted that it used the AMP Code to access and reset the License Expiration Files on Olshan's and Plyler's servers.

73.     As explained above, on July 24, 2018, ECI sent an updated License Expiration File to Plyler's server with an encoded entry that translated to an expiration date of July 31, 2018—or seven days later.  Plyler's phone records reveal that Plyler placed two calls to Matatall at 3:52 p.m. on July 24, 2018.  Tellingly, Prosperity then called Plyler at 6:21 p.m. on July 24, 2018—the very time the logs indicate an unauthorized third party modified Plyler's License Expiration File with an encoded entry that translates to December 31, 2018.  Upon information and belief, on July 24, 2018, Plyler called Matatall to request help with the License Expiration File, Matatall relayed the request to Prosperity, Prosperity used the AMP Code to modify Plyler's License Expiration File, and then Prosperity called to inform Plyler that it had successfully modified the License Expiration File.

74.     Ann Wade, Olshan's corporate representative, testified that Prosperity reset the License Expiration File on Olshan's server four times.  Relatedly, Ann Wade sent the following

email to Prosperity regarding the events of July 24, 2018 in which she discussed Ed Baldridge, Prosperity's employee, resetting the License Expiration File on Olshan's server:

> **From:** Ann T. Wade <anntwade@olshanlumber.com>
> **Sent:** Wednesday, July 25, 2018 10:11 AM
> **To:** wfrazier@prosperityerp.com; Tim Goedeke <tgoedeke@prosperityerp.com>
> **Cc:** Rusti Ledermann <rusti@olshanlumber.com>
> **Subject:** Software License
>
> I called Ed yesterday, as we had the notice that our Software License would expire in 7 days again.  He fixed it, but was concerned that we might be in trouble if we continue to do this.
>
> By no means am I trying to hurry you … since I know there are several things that are not compatible with the way we do business.  But…  will the day come that Ed's fix will not work?
>
> Ann

75.     When explaining Prosperity's choice to reset the License Expiration Files on Plyler's and Olshan's servers, Frazier testified that he "made a business decision based on the fact that [Prosperity was] in the process of converting [Olshan and Plyler] to [Prosperity's] software."

76.     The above testimony, the telephone and email communications, and the fact that the License Expiration Files were altered the very day ECI updated them reveals that Plyler and Olshan conspired with the Prosperity Defendants to access and use the AMP Code to circumvent ECI's technology controls in the Advantage software that limit access to ECI's copyrighted Advantage software.

77.     After ECI commenced this litigation, Plyler asserted that it owns a version of the Advantage software source code and that it owns a perpetual license to use the Advantage software. ECI disputes and denies these assertions.  Moreover, ECI notes that, until it filed the instant lawsuit, it was unaware of Plyler's assertion that it owned the source code or that it had a non-standard license.

**E.**     **The Defendants' Access to the Advantage Software**

78.     As the original author of the Advantage software and as an employee of ECI, Matatall had access to the Advantage software including the source code and object code for the

Advantage software.  After ECI terminated Matatall's employment, as ECI's landlord, Matatall still had physical access to ECI's offices until ECI moved in 2016.  Matatall also had access to the Advantage software on Plyler and Olshan's servers based on his status as an employee of Prosperity and his longstanding relationships with Plyler and Olshan.  Upon information and belief, Matatall has access to the Stolen Drive Information and Customer Files stolen in July 2016.

79.     As employees of ECI, Frazier and Baldridge had access to the Advantage software including the source code and object code for the Advantage software.  Frazier and Baldridge also had access to the Advantage software on Plyler and Olshan's servers based on their roles in Prosperity.  Upon information and belief, Prosperity has had access to the Advantage software and ECI Updates through Matatall, Frazier, and Baldridge, as well as through the its other employees and other unknown persons working for their benefit.

80.     Plyler and Olshan had access to the Advantage software for years because it was installed on their servers.  This access to the Advantage software continued until at least mid-August 2018.

81.     The Defendants' access to the Advantage software has allowed them to access the underlying source code including, but not limited to, proprietary algorithms, workflows, and database structures (the "Source Code & Business Logic").

## F.     The Defendants Copy the Advantage Software

82.     The Defendants copied the Advantage software.  For example, each time the Advantage software is launched, a significant portion of the source code is copied into the server's random-access memory.  As explained herein, each of the Defendants has participated and been involved in using, and thus copying, the Advantage software.

83.    Upon information and belief, during early and mid-2018, Olshan worked closely with Prosperity, Matatall, and Frazier to copy particular elements of the Advantage software and incorporate them into Prosperity's software (the "Prosperity ERP") by, among other things, reverse engineering the functionality of the Advantage software.  In one email chain, Timothy Goedeke, a Prosperity employee, explained to Olshan: "I am looking for those things that if your [Advantage software] system were off today what would keep you from closing your store until it was back online."  For its part, Olshan was particularly concerned that the Prosperity ERP would have the ability to generate certain reports that were generated by the Advantage software.  In response to an Olshan email asking if certain reports generated by the Advantage software were available in the Prosperity ERP, Prosperity employee Pam Bronnum responded that if the reports had not been covered in training, they "would have to be put in as a programming request."  Olshan even sent screenshots of the Advantage software to Prosperity to aid Prosperity in its efforts to duplicate elements and features of the Advantage software in the Prosperity ERP.  This enabled Prosperity to further replicate the Source Code & Business Logic of the Advantage software.

84.    Upon information and belief, the Prosperity ERP is itself a derivative work of the Advantage software.  Furthermore, upon information and belief, each time the Defendants install or run the Prosperity ERP they are copying the Advantage software and/or a derivative work of the Advantage software.

## G.    ECI Obtains Injunctive Relief and Plyler, Olshan, and Prosperity Certify Compliance

85.    On August 13, 2018, the Court entered an Agreed Temporary Restraining Order that enjoined Plyler and Olshan from using the Advantage software for any purpose whatsoever; required Plyler and Olshan to have a third-party delete the Advantage software on or before August 15, 2018; required Plyler and Olshan each to certify to the Court that the software had been deleted

and they possessed no other versions of the Advantage software; enjoined Prosperity from accessing, using, or tampering with the Advantage software, wherever located, for any purposes whatsoever; and enjoined Prosperity from assisting, encouraging, facilitating, or otherwise supporting any of ECI's then-current or former customers or third parties in accessing, using, modifying, or tampering with the Advantage software for any purposes whatsoever.

86.     On August 17, 2018, Plyler and Olshan filed documents certifying the Advantage software had been deleted and they possessed no other versions of the Advantage software.

87.     On August 28, 2018, by consent of the Parties, the Court extended the Temporary Restraining Order through and until the Court's ruling on ECI's motion for Preliminary Injunction.

88.     The Parties negotiated and submitted a joint motion and an Agreed Preliminary Injunction in which Plyler, Olshan, and Prosperity agreed to the entry of the Agreed Preliminary Injunction and to be bound by the same.  On September 12, 2018, the Court entered the Agreed Preliminary Injunction that required Plyler and Olshan each to certify it had been in compliance with the temporary restraining order since its entry and that its original certification remained true in all respects; enjoined Plyler and Olshan from reinstalling or using the Advantage software for any purpose; and enjoined them from using or disclosing the AMP Code (referred to in the order as the "AMP Command") to a third-party in a manner inconsistent with the orders of the Court. Moreover, the Court required Prosperity to certify that it did not possess, directly or indirectly, any copies of the Advantage software; enjoined from Prosperity using the AMP Code, for any reason whatsoever; enjoined Prosperity from disclosing the AMP Code to any third party in a manner inconsistent with the orders of the Court; enjoined Prosperity from directly or indirectly accessing, using, modifying, copying, or tampering with the Advantage Software for any purposes whatsoever and regardless of where located; enjoined Prosperity from directly or indirectly

assisting, encouraging, or facilitating ECI's current or former customers or third parties in modifying, tampering with, or copying the Advantage Software for any purposes whatsoever.

89.     On September 17, 2018, Plyler and Olshan each certified to the Court that it had been in compliance with the temporary restraining order since its entry and that its original certification remained true and correct in all respects.  On September 18, 2018, Prosperity certified to the Court that Prosperity did not "possess, directly or indirectly, and copies of the Advantage Software as that term is defined in the Agreed Preliminary Injunction."

## H.     ECI Detects Further Prohibited Activity

90.     Following the filing of this action, ECI continued to monitor regularly the activity on its AMP server.  The AMP server periodically receives "pings" from the Advantage software. In order for the AMP server to receive "pings," the system requires: (i) a functioning version of the Advantage software; (ii) that the system hosting the software be connected to the internet; and (iii) the Advantage software to be running an "end of day" process.

91.     On August 16, 2018, the AMP server received three "pings" associated with Plyler.

92.     On August 21, 2018, the AMP server received four "pings" associated with Olshan. Moreover, the "pings" indicated that Olshan, or someone accessing Olshan's system, was running a newer version of the Advantage software than ECI had ever provided to Olshan.  The "pings" also indicated that the version of the Advantage software Olshan, or someone accessing Olshan's system, was running on August 21, 2018 was newer than the version Olshan was running on August 1, 2018.

93.     As explained above, the temporary restraining order required Olshan and Plyler to cease using the Advantage software and to delete the Advantage software no later than August 15, 2018.  Importantly, on September 17, 2018, both Plyler and Olshan certified to the Court that they

had been in compliance with the temporary restraining order <u>since its entry</u>.  Yet, the "pings" indicate that Plyler, Olshan, or someone accessing their systems, was still running the Advantage software on August 16, 2018 and August 21, 2018, respectively.

94.     Prosperity had access to Plyler's and Olshan's systems including access through the firewalls on those systems.  Without accessing the databases in the Advantage software, it would incredibly difficult and time consuming, to the point of near impossibility, for the Prosperity Defendants to migrate the data of a customer that had been using the Advantage software and was switching to the Prosperity ERP.  The "pings" indicate that the Defendants were using the Advantage software to migrate Plyler's and Olshan's data from the Advantage software to the Prosperity ERP.  To export that customer data from the end of day backup servers to the Prosperity ERP, it would have been necessary for Prosperity to access and use ECI's Source Code & Business Logic.  Prosperity was prohibited under the TRO and Agreed Preliminary Injunction from accessing or using the Advantage Software, including in the manner described herein.

I.     **Prosperity Accesses the Advantage Software in Violation of the Preliminary Injunction**

95.     On January 14, 2019, ECI received a telephone call from Pike County Lumber Company ("Pike County").  Pike County was an ECI customer that used the Advantage software until December 25, 2018, when Pike County's license to use the Advantage software terminated.  Since, on January 14, 2019, Pike County was still within the grace period following the termination of its license to use the Advantage software, and Pike County should still have been able to access and use the Advantage software on a "read only" basis to view its historical data contained within the program but not to process new sales or transactions.

96.     Pike County informed ECI that it was unable to access and use the Advantage software to view its historical data and requested ECI's assistance in resolving the issue.  Pike

County provided ECI with access to Pike County's servers, which ECI accessed remotely on January 14, 2019.  In the course of providing the requested support services to Pike County to determine the cause of the problem, ECI discovered that Prosperity accessed the Advantage software running on Pike County's servers on October 15 and 23, November 1, 14, 15, 16, 19, 20, and 28, and December 4, 12, 13, 18, and 28 (all 2018).

97.     While accessing the Advantage software running on Pike County's servers in October, November, and December of 2018, Prosperity used the Advantage software by, among other things, running various commands that exported data from the databases for Pike County's Advantage software.   On multiple occasions, Prosperity sent the exported data to "ftp.prosperityerp.com" and to "ftp 199.83.230.111," an IP address for a secure data center in Tyler, Texas.  Further, the logs for Pike County's Advantage software reveal that Prosperity additionally ran the commands "nxgendump.sh," "ping ftp.prosperityerp.com."   The final commands reflected on the logs for Pike County's Advantage software show that Prosperity twice ran the command "scp 20181218_Pike_GoLive.tgz prosperity@208.75.24.51."  The final set of numbers in that command sequence, "208.75.24.51," is an IP address for prosperityerp.com.

98.     These commands again reveal that Prosperity continues to access and use ECI's Source Code & Business Logic, including accessing databases and exporting that data into file structures based on knowledge of ECI's intellectual property.  Prosperity was prohibited under the TRO and Agreed Preliminary Injunction from accessing or using the Advantage Software, including in the manner described herein.

**J.     The Copyright Office Registers ECI's Copyrights**

99.     On February 6, 2019, ECI filed applications to register its copyrights for three versions of its Advantage software.  Thereafter, the United States Copyright Office registered

ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for those three versions of the Advantage software.  The Certificates of Registration are attached hereto as Exhibit A.

## V.   CAUSES OF ACTION

### Count 1: Misappropriation of Trade Secrets (DTSA) (All Defendants)

100.   ECI adopts the preceding paragraphs as if fully set forth herein.

101.   The Defend Trade Secrets Act codified at Title 18, Section 1836 of the United States Code provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

102.   The AMP Code is a trade secret.  ECI's AMP Code is of independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information because it enables ECI to strictly control access to its Advantage software and thereby monetize the Advantage software through its licensing program.

103.   The ECI Laptop Data and the Customer Files contain trade secrets.  The trade secrets contained in the ECI Laptop Data and Customer Files are of independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information because they enable ECI to effectively market is products in a targeted manner to specific customers and potential customers and to maintain and improve its relationships with specific customers and potential customers.  For example, ECI is at a material advantage and anyone else lacking the trade secrets in the ECI Laptop Data and the Customer Files is at a material

disadvantage in marketing to and servicing and supporting ECI's customers as effectively as ECI.

Additionally, anyone lacking the information regarding customer-specific modifications to the

Advantage software that is contained trade secrets in the Customer Files would face significant

difficulty in providing satisfactory software and service and support to that customer.

104.    The Email Data contains trade secrets.  The trade secrets contained in the Email

Data are of independent economic value, actual and potential, from not being generally known to,

and not being readily ascertainable through proper means by, another person who can obtain

economic value from the disclosure or use of the information because they enable ECI the ability

to provide support and service to its customers.  For example, ECI is at a material advantage and

anyone else lacking the trade secrets in the Email Data is at a significant disadvantage in providing

satisfactory service and support for relevant portions of the Advantage software and to ECI's

customers.

105.    The Stolen Drive Information contained on the hard drive that was stolen on the

weekend of July 4, 2016, contained trade secrets and the Superuser Login is a trade secret.  The

trade secrets in the Stolen Drive Information and the Superuser Login are of independent economic

value, actual and potential, from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or

use of the information because, among other things, they give ECI the unique ability to update and

edit easily its Advantage software.  The Superuser login allows unfettered access to and ability to

manipulate, update, service, support, and use the Advantage software.  Additionally, the Stolen

Drive Information contains, among other things, updates and patches to address issues ECI's

customers have encountered and the latest, most advanced functionality of the Advantage

software, which puts ECI at a material advantage and anyone else lacking such updates and patches

at a significant disadvantage in providing satisfactory service and support for the Advantage software and to ECI's customers.  ECI has spent substantial amounts to develop and refine the trade secrets contained in the Stolen Drive Information.  If someone was starting from scratch to develop or update a competing software and did not have the trade secrets contained in the Stolen Drive Information, it would require a tremendous financial investment and likely many years to create a product that might be able to compete effectively against the Advantage software.

106.    The Source Code & Business Logic contain trade secrets.  The trade secrets contained in the Source Code & Business Logic are of independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  ECI paid millions of dollars to acquire the trade secrets contained in the Source Code & Business Logic that then existed because ABC had spent years developing them.  Moreover, since purchasing the Advantage software ECI has spent millions more to continue developing, refining, and adding to the trade secrets contained in the Source Code & Business Logic.  For example, ECI is able to market the Advantage software to customers with certain types of business because the trade secrets contained in the Source Code & Business Logic have been developed to address specifically the complex issues in those business.  If someone was starting from scratch to develop a competing software and did not have the trade secrets contained in the Source Code & Business Logic, it would require a tremendous financial investment and likely many years to create a product that might be able to compete effectively against the Advantage software.

107.    ECI owns trade secrets including, but not limited to, the AMP Code and Superuser Login as well as the trade secrets contained in the ECI Laptop Data, the Customer Files, the Email

Data, the Stolen Drive Information, and the Source Code & Business Logic (collectively, the "Trade Secrets").

108.    ECI takes significant measures to maintain the secrecy of its Trade Secrets by, among other things, requiring employees to sign confidentiality and non-disclosure agreements, by restricting access to its Trade Secrets, and by requiring password login to access its Trade Secrets.  Additional measures ECI takes include, but are not limited to:

a) Designing the Advantage software in a way that requires knowledge of a proprietary and confidential programing language to execute many critical functions within the Advantage software;

b) Limiting access to certain command functions, such as the AMP Code to only key employees and blocking out the display feature of those functions so that they do not appear on the screen when the command is entered on a computer;

c) Requiring employees to execute agreements to protect and preserve ECI's trade secrets;

d) Requiring terminated employees to return all ECI property and to be removed from the ECI's security systems;

e) Assigning usernames and passwords for all computer users and requiring the password to be at least seven characters, including an uppercase letter, lowercase letter, and number;

f) Prohibiting computer access after a certain number of failed password attempts are made;

g) Using Windows "Active Directory Groups" to control access to various network drives and requiring and all changes to an employee's user access be approved by an IT administrator;

h)  Maintaining an acceptable use policy relating to computer, internet, and email usage;

i)  Requiring the use of the Superuser Login or other custom login to conduct certain activity within the Advantage software; and

j)  Otherwise limiting the disclosure of ECI's Trade Secrets to maintain and protect the value of the information contained therein so as to provide ECI a competitive advantage.

109.    In connection with the Advantage software, ECI expressly required ABC to assign all of its associated rights and interests in and to the intellectual property to ECI and ECI has been forced to bring litigation in the past against the Prosperity Defendants to secure additional agreements to maintain the integrity of those trade secrets, including, but not limited, agreements providing express representations and warranties that Prosperity would not use ECI's trade secrets or access the Advantage software.

110.    ECI's Trade Secrets relate to the Advantage software, which is used in interstate and foreign commerce.  Furthermore, ECI uses the Trade Secrets themselves in interstate and foreign commerce to, among other things, update license-expiration dates on customers' servers around the country and the world, update the Advantage software on customers' servers around the country and the world, and market its products to existing customers and potential customers around the country and world.  ECI has used its Trade Secrets in Texas in relationship to Plyler's use of the Advantage software in Arkansas.

111.    Upon information and belief, Plyler and Olshan have misappropriated ECI's Trade Secrets by acquiring and/or using, among other Trade Secrets, the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic, when Plyler and Olshan knew or had reason to know they were acquired by theft and/or in breach or inducement of a breach of

a duty to maintain secrecy because they were obtained from the Prosperity Defendants and not ECI, the owner of the Trade Secrets and the owner and exclusive licensor of the Advantage software.  Upon information and belief, the Prosperity Defendants have misappropriated ECI's trade secrets by, among other things, acquiring and/or using the Trade Secrets when they knew or had reason to know they were acquired by theft and/or in breach or inducement of a breach of a duty to maintain secrecy because, among other things, the Prosperity Defendants stole the Trade Secrets, agreed not to disclose ECI's trade secrets, knew the terms of the settlement agreement with ECI, and knew ECI had EULAs with its customers that prohibited third-party access to the Advantage software.

112.    Upon information and belief, Plyler and Olshan have misappropriated ECI's Trade Secrets by, among other things, using the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic without ECI's express or implied consent when they induced the Prosperity Defendants to breach their duties to maintain secrecy to acquire knowledge of the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic.  Upon information and belief, the Prosperity Defendants have misappropriated ECI's Trade Secrets by, among other things, disclosing and/or using the Trade Secrets without ECI's express or implied consent when the Prosperity Defendants acquired the Trade Secrets by stealing them from ECI and/or by inducing ECI's customers to breach their EULAs that prohibited third-party access to the Advantage software.

113.    Upon information and belief, Plyler and Olshan have misappropriated ECI's Trade Secrets by, among other things, using the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic without ECI's express or implied consent when they knew or had reason to know that knowledge of the AMP Code, the Superuser Login, and/or trade secrets

in the Source Code & Business Logic was derived from and through the Prosperity Defendants, who had stolen the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic, acquired them in breach of a settlement agreement with ECI, and/or acquired them by inducing ECI's customers to breach their EULAs that prohibited third-party access to the Advantage software.   Upon information and belief, the Prosperity Defendants have misappropriated ECI's Trade Secrets by, among other things, using trade secrets in the Source Code & Business Logic without ECI's express or implied consent when they knew or had reason to know that knowledge of trade secrets in the Source Code & Business Logic was derived from and through Plyler and Olshan who breached their EULAs that prohibited third-party access to the Advantage software.

114.   Upon information and belief, Plyler and Olshan have misappropriated ECI's Trade Secrets by, among other things, using the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic without ECI's express or implied consent when they knew or had reason to know that the Prosperity Defendants acquired knowledge of the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic under circumstances where the Prosperity Defendants had a duty to maintain secrecy of the AMP Code, the Superuser Login, and trade secrets in the Source Code & Business Logic and/or were prohibited from using the AMP Code, the Superuser Login, and trade secrets in the Source Code & Business Logic under a settlement agreement with ECI.   Upon information and belief, the Prosperity Defendants have misappropriated ECI's Trade Secrets by, among other things, disclosing and/or using the Trade Secrets without ECI's express or implied consent when they knew or had reason to know that they acquired knowledge of the Trade Secrets under circumstances where the Prosperity Defendants had a duty to maintain secrecy of the Trade Secrets, were prohibited from using the Trade Secrets

under a settlement agreement with ECI, and/or ECI's customers were under a duty to prohibit third-party access.

115.    Upon information and belief, Plyler and Olshan have misappropriated ECI's Trade Secrets by, among other things, disclosing and/or using the AMP Code, the Superuser Login, and trade secrets in the Source Code & Business Logic without ECI's express or implied consent when they knew or had reason to know that knowledge of the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic were derived from or through the Prosperity Defendants who owed duties to ECI to maintain secrecy of the AMP Code, the Superuser Login, and trade secrets in the Source Code & Business Logic, were prohibited from using the AMP Code, the Superuser Login, and/or trade secrets in the Source Code & Business Logic under a settlement agreement with ECI, and/or when Plyler and Olshan knew or had reason to know that knowledge of the trade secrets in the Source Code & Business Logic were derived from or through ECI's customers who provided the Prosperity Defendants access to the Advantage software in violation of their EULAs with ECI.   Upon information and belief, the Prosperity Defendants have misappropriated ECI's Trade Secrets by, among other things, disclosing and/or using the Trade Secrets without ECI's express or implied consent when they knew or had reason to know that knowledge of the Trade Secrets was derived from or through the Prosperity Defendants who owed a duty to ECI to maintain secrecy of the Trade Secrets and/or were prohibited from using the Trade Secrets under a settlement agreement with ECI and/or were derived from or through ECI's customers who provided the Prosperity Defendants access to the Advantage software in violation of their EULAs with ECI.

116.    Additionally, the Defendants agreed and conspired together to misappropriate ECI's Trade Secrets as set forth herein.

117.    ECI has suffered and is continuing to suffer actual losses caused by the misappropriation of its Trade Secrets, and ECI is entitled to recover damages for those losses. ECI's damages include, but are not limited to, lost profits, the cost to reproduce the trade secrets, the value of the trade secrets, and a reasonable license fee for the unauthorized use of the Advantage software.  ECI is also entitled to recover damages for unjust enrichment caused by the misappropriation of its trade secrets.  Because Plyler and Olshan knowingly used the Advantage software in their businesses without paying for the license fee, any revenue they generated from acquiring, disclosing, using, or accessing ECI's Trade Secrets, including, but not limited to, the AMP Code, Superuser Login, and trade secrets contained in the Source Code & Business Logic, constitutes unjust enrichment.  Because the Prosperity Defendants acquired, disclosed, used, and accessed the Trade Secrets to, among other things, give Plyler and Olshan access to the Advantage software without any right to do so, any revenue the Prosperity Defendants generate and generated from using or disclosing the Trade Secrets constitutes unjust enrichment.

118.    Defendants' misappropriation was done willfully and maliciously, and ECI seeks exemplary damages from Defendants.

119.    As a result of Defendants' willful and malicious violation of the DTSA, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  ECI seeks to recover such attorney's fees and costs under the DTSA pursuant to 18 U.S.C. § 1836(b)(3)(D).

### Count 2: Misappropriation of Trade Secrets (TUTSA) (All Defendants)

120.    ECI adopts the preceding paragraphs as if fully set forth herein.

121.     The actions described in the preceding paragraphs above also constitute misappropriation of trade secrets under the Texas Uniform Trade Secret Act ("TUTSA"), codified at Chapter 134A of the Texas Civil Practice and Remedies Code.

122.     In addition to the relief sought under TUTSA, ECI also seeks exemplary damages for the willful and malicious misappropriation of its trade secrets.

123.     As a result of Defendants' willful and malicious violation of TUTSA, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  ECI seeks to recover such attorney's fees and costs under TUTSA pursuant to Section 134A.005 of the Texas Civil Practice and Remedies Code.

## Count 3: Circumvention of Copyright Protection Systems (DMCA) (All Defendants)

124.     ECI adopts the preceding paragraphs as if fully set forth herein.

125.     The Advantage software is a copyrighted work as evidenced by the attached Certificates of Registration.  ECI effectively controls access to its copyrighted work, the Advantage software, with technological measures including, but not limited to, License Expiration Files that contain encoded expiration dates that ordinarily may only be changed by ECI using its proprietary AMP Code.

126.     The Defendants circumvented the License Expiration Files in Plyler's and Olshan's servers by using the AMP Code to change the dates encoded in those files.  Defendants improperly accessed and ran programming that was designed to, and did, avoid, bypass, remove, deactivate, or impair the License Expiration Files' ability to control access to the Advantage software.  ECI did not give authority to Defendants to use the AMP Code, circumvent the License Expiration Files, or access the Advantage software.

127.    ECI has suffered and is continuing to suffer actual losses caused by the circumvention of its technological measures that effectively control access to the Advantage software, and ECI is entitled to recover damages for those losses.  ECI's damages include, but are not limited to, lost profits, the cost to reproduce the copyrighted Advantage software, the value of the copyrighted Advantage software, and a reasonable license fees for the unauthorized use of the Advantage software.  ECI is also entitled to recover damages for profits of the Defendants that are attributable to the Defendants' circumvention of ECI's technological measures that effectively control access to the Advantage software and are not taken into account in computing actual damages.  Because Plyler and Olshan, knowingly used the Advantage software in their businesses without paying for the license fee, any profits they generated from circumventing ECI's technological measures that effectively control access to the Advantage software constitute profits attributable to the violation.  Because the Prosperity Defendants disclosed and used the AMP Code to give Plyler and Olshan access to the Advantage software without any right to do so, any profits the Prosperity Defendants generate and generated from circumventing ECI's technological measures that effectively control access to the Advantage software constitute profits attributable to the violation.  ECI also seeks all available statutory damages as authorized by the DMCA pursuant to 17 U.S.C. §§ 1203(c)(1)(B) and 1203(c)(3).

128.    As a result of Defendants' violation of the DMCA, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  ECI seeks to recover such attorney's fees and costs under the DMCA pursuant to 17 U.S.C. § 1203(b)(5) and all associated costs of litigation pursuant to 17 U.S.C. § 1203(b)(4).

## **Count 4: Direct Copyright Infringement (Plyler and Olshan)**

129.    ECI adopts the preceding paragraphs as if fully set forth herein.

130.    On February 6, 2019, ECI filed applications to register copyrights for 2007, 2014 and 2018 versions of its Advantage software.   Thereafter, the United States Copyright Office registered ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for those three versions of the Advantage software.   The Advantage software is a copyrighted work as evidenced by the Certificates of Registration attached hereto as Exhibit A.

131.    As detailed above, ECI owns copyrights in and to the Advantage software.

132.    ECI entered into EULAs permitting Plyler and Olshan to use the Advantage software for certain purposes.   Nevertheless, Plyler's and Olshan's licenses terminated no later than May 2018 and March 2017 respectively.

133.    Moreover, Plyler and Olshan used the Advantage software in ways that fell outside the scope of their licenses.

134.    After their licenses terminated and despite the fact that Plyler and Olshan did not have any rights in or authorization to use the Advantage software, they used the Advantage software continuously to run their businesses through at least August 2018.   Each time Plyler and Olshan launched the Advantage software, they caused a significant portion of the Advantage software's source code to be copied to their computers.

135.    Upon information and belief, the Prosperity ERP is itself a derivative work of the Advantage software.   Plyler and Olshan use the Prosperity ERP.   Furthermore, upon information and belief, each time Plyler and Olshan install or run the Prosperity ERP they are copying the Advantage software and/or a derivative work of the Advantage software.

136.    Plyler and Olshan have engaged in such activities with actual knowledge that ECI did not give any oral or written permission, license, consent, or authorization.   Plyer's and Olshan's

conduct therefore constitutes deliberate and willful infringement of ECI's copyrights under the Copyright Act of 1976.

137.    In light of the above, ECI is entitled to injunctive relief pursuant to 17 U.S.C. § 502 as well as its actual damages suffered as a result of the infringement and any profits of Plyler and Olshan that are attributable to the infringement and not taken into account in computing actual damages, pursuant to 17 U.S.C. § 504.

138.    As a result of Plyler's and Olshan's infringing activities, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. ECI seeks to recover such attorney's fees and costs under 17 U.S.C. § 505.

### Count 5:  Direct Copyright Infringement (Prosperity Defendants)

139.    ECI adopts the preceding paragraphs as if fully set forth herein.

140.    On February 6, 2019, ECI filed applications to register copyrights for 2007, 2014 and 2018 versions of its Advantage software.  Thereafter, the United States Copyright Office registered ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for those three versions of the Advantage software.  The Advantage software is a copyrighted work as evidenced by the Certificates of Registration attached hereto as Exhibit A.

141.    As detailed above, ECI owns copyrights in and to the Advantage software.

142.    ECI has never entered into an agreement with the Prosperity Defendants pursuant to which it conveyed or licensed, or is presently obligated to convey or license, any right, title, or interest in the copyrights in the Advantage software.  For example, ECI has never executed a written agreement transferring any such interest in its copyrights to the Prosperity Defendants, as is required by 17 U.S.C. § 204(a).

143.     Despite the fact that the Prosperity Defendants did not have any rights in the Advantage software, upon information and belief, the Prosperity Defendants copied and/or reverse engineered the Advantage software to derive the Prosperity ERP.

144.     Upon information and belief, Prosperity worked with Olshan to infringe ECI's copyrights by having Olshan identify essential elements of Advantage software and provide screenshots from Advantage software to Prosperity so that Prosperity could, among other things, reverse engineer those elements and incorporate them into the Prosperity ERP.  Upon information and belief, Prosperity actually incorporated those elements into the Prosperity ERP.

145.     Upon information and belief, the Prosperity ERP is an unauthorized derivative work of the Advantage software owned and licensed exclusively by ECI.

146.     Upon information and belief, when Matatall was ECI's landlord, he used his access to ECI's office to steal or participate in the theft of the Stolen Drive Information, directed someone else to steal it, or someone stole it for his direct benefit.  Upon information and belief, the Prosperity Defendants used and copied the Stolen Drive Information, including, but not limited to, the Advantage software that was on the stolen hard drive including, but not limited to, its source code.

147.     Upon information and belief, Prosperity accessed the Advantage software that was on Plyler's and Olshan's servers, used the Advantage software, and copied the Advantage software.  Upon information and belief, Frazier directed Prosperity employees to access, use, and copy the Advantage software that was on Plyler's and Olshan's servers.

148.     Upon information and belief Ed Baldridge accessed, used, and copied the Advantage software that was on Plyler's and Olshan' servers.

149.    Upon information and belief, Prosperity copied the Advantage software from Plyler's and Olshan's servers and the Stolen Drive Information and has used and is continuing to use such Advantage software, including, but not limited to, its source code, to develop and market infringing, derivative software products, including the Prosperity ERP.  In so doing, Prosperity copied all or part of the source code used in the Advantage software and/or all or part of the Advantage software's non-literal elements, including the selection, arrangement, structure, sequence, and organization of those elements in order to create derivative works.  Additionally, upon information and belief, after Olshan identified key elements of the Advantage software and sent screenshots of the Advantage software to Prosperity, Prosperity reverse engineered and/or copied those elements into the Prosperity ERP.

150.    Furthermore, upon information and belief, Pike County's servers indicate that Prosperity, or someone working on its behalf, launched and used the Advantage software to export data out of the Advantage software.

151.    Upon information and belief, the Prosperity Defendants launched the Advantage software and caused a significant portion of the Advantage software's source code to be copied.

152.     Frazier is individually liable because he specifically directed the copying and use of the Advantage software.  Frazier is also individually liable because, by virtue of his position as the owner of Prosperity, he has derived, and continues to derive, a financial benefit from the infringement of ECI's copyrights.

153.    Upon information and belief, Matatall is individually liable because, by virtue of his employment with Prosperity, status as Prosperity's landlord, experience in the software industry, relationships with Frazier and other Prosperity employees, and close relationships with Plyler and Olshan, he is a dominant influence in Prosperity and promoted the policies of Prosperity

that resulted in the infringement of ECI's copyrights.  Upon information and belief, Matatall directed the copying of the Advantage software and the creation of a derivative work.  Upon information and belief, he is also individually liable because he either stole or directed the theft of the Stolen Drive Information from ECI's offices so that it could be used and copied.  Upon information and belief, Matatall continues to derive a financial benefit from the infringement of ECI's copyrights by virtue of his association with Prosperity and status as Prosperity's landlord.

154.    Upon information and belief, Baldridge is individually liable because he was personally involved in the copying and use of the Advantage software that was on Plyler's and Olshan's servers.  Upon information and belief, Baldridge continues to derive a financial benefit from the infringement of ECI's copyrights by virtue of his employment with Prosperity and remuneration he receives from Matatall for being loyal to Matatall and his business interests.

155.    Upon information and belief, the Prosperity ERP is itself a derivative work of the Advantage software.  The Prosperity Defendants use, market, and install the Prosperity ERP. Furthermore, upon information and belief, each time the Prosperity Defendants install or run the Prosperity ERP, they are copying the Advantage software and/or a derivative work of the Advantage software.

156.    The Prosperity Defendants have engaged in, and are continuing to engage in, such activities with actual knowledge that ECI did not give any oral or written permission, license, consent, or authorization.  The Prosperity Defendants' conduct therefore constitutes deliberate and willful infringement of ECI's copyrights under the Copyright Act of 1976.

157.    In light of the above, ECI is entitled to injunctive relief pursuant to 17 U.S.C. § 502 as well as its actual damages suffered as a result of the infringement and any profits of the

Prosperity Defendants that are attributable to the infringement and not taken into account in computing actual damages, pursuant to 17 U.S.C. § 504.

158.    As a result of the Prosperity Defendants' infringing activities, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. ECI seeks to recover such attorney's fees and costs under 17 U.S.C. § 505.

### Count 6:  Indirect Copyright Infringement (Prosperity Defendants)

159.    ECI adopts the preceding paragraphs as if fully set forth herein.

160.    On February 6, 2019, ECI filed applications to register copyrights for 2007, 2014 and 2018 versions of its Advantage software.  Thereafter, the United States Copyright Office registered ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for those three versions of the Advantage software.  The Advantage software is a copyrighted work as evidenced by the Certificates of Registration attached hereto as Exhibit A.

161.    As detailed above, ECI owns copyrights in and to the Advantage software.

162.    The Prosperity Defendants knew and were aware that Plyler and Olshan did not have current licenses to use the Advantage software.

163.    The Prosperity Defendants knew and were aware that Plyler and Olshan circumvented the License Expiration files to obtain access to, use, and copy the Advantage software after their licenses had expired.

164.    The Prosperity Defendants instructed and directed Plyler and Olshan to circumvent the License Expiration files to obtain access to, use, and copy the Advantage software after their licenses had expired.

165.    The Prosperity Defendants contributed to Plyler's and Olshan's infringement of ECI's copyrights by helping them circumvent the License Expiration Files on Plyer's and Olshan's

servers so Plyler and Olshan could continue to use the Advantage software after their licenses were terminated.

166.    Frazier is individually liable because he contributed to Plyler's and Olshan's infringement of ECI's copyrights by, among other things, specifically directing Prosperity employees to circumvent the License Expiration Files on Plyer's and Olshan's servers so Plyler and Olshan could continue using the Advantage software without licenses.  Frazier is individually liable because, by virtue of his position as owner of Prosperity, he has derived, and continues to derive, a financial benefit from the infringement of ECI's copyrights.

167.    Upon information and belief, Baldridge is individually liable because he contributed to Olshan's infringement of ECI's copyrights by, among other things, resetting the date in the License Expiration File on Olshan's server.  Upon information and belief, Baldridge continues to derive a financial benefit from the infringement of ECI's copyrights by virtue of his employment with Prosperity and remuneration he receives from Matatall for being loyal to Matatall and his business interests.

168.    Upon information and belief, Matatall is individually liable because he contributed to Plyler's infringement of ECI's copyrights by, among other things, coordinating Prosperity's circumvention efforts with Plyler.  Upon information and belief, Matatall continues to derive a financial benefit from the infringement of ECI's copyrights by virtue of his association with Prosperity and status as Prosperity's landlord.

169.    The Prosperity Defendants have engaged in, and are continuing to engage in, such activities with actual knowledge that ECI did not give any oral or written permission, license, consent, or authorization.  The Prosperity Defendants' conduct therefore constitutes deliberate and willful infringement of ECI's copyrights under the Copyright Act of 1976.

170.     In light of the above, ECI is entitled to injunctive relief pursuant to 17 U.S.C. § 502 as well as its actual damages suffered as a result of the infringement and any profits of the Prosperity Defendants that are attributable to the infringement and not taken into account in computing actual damages, pursuant to 17 U.S.C. § 504.

171.     As a result of the Prosperity Defendants' infringing activities, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. ECI seeks to recover such attorney's fees and costs under 17 U.S.C. § 505.

### Count 7:  Indirect Copyright Infringement (Plyler and Olshan)

172.     ECI adopts the preceding paragraphs as if fully set forth herein.

173.     On February 6, 2019, ECI filed applications to register copyrights for 2007, 2014 and 2018 versions of its Advantage software.  Thereafter, the United States Copyright Office registered ECI's copyrights and issued Certificates of Registration with effective dates of February 6, 2019, for those three versions of the Advantage software.  The Advantage software is a copyrighted work as evidenced by the Certificates of Registration attached hereto as Exhibit A.

174.     As detailed above, ECI owns copyrights in and to the Advantage software.

175.     Plyler and Olshan knew and were aware that the Prosperity Defendants did not have licenses to use the Advantage software.

176.     Plyler and Olshan contributed to the Prosperity Defendants' infringement of ECI's copyrights by allowing them to access, use, and copy the Advantage software that was located on Plyler's and Olshan's servers.

177.     Upon information and belief, Olshan also contributed to Prosperity's infringement of ECI's copyrights by identifying essential elements of Advantage software and providing screenshots from Advantage software to Prosperity so that Prosperity could, among other things,

reverse engineer those elements and incorporate them into the Prosperity ERP or copy those elements into the Prosperity ERP.  Upon information and belief, Prosperity actually incorporated those elements into the Prosperity ERP.

178.    Plyler and Olshan received a financial benefit from the infringement of ECI's copyrights because, in exchange for allowing the Prosperity Defendants to access the Advantage software on Plyler's and Olshan's servers, the Prosperity Defendants enabled Plyler and Olshan to use the Advantage software free of charge.

179.    Plyler and Olshan have engaged in such activities with actual knowledge that ECI did not give any oral or written permission, license, consent, or authorization.  Plyler's and Olshan's conduct therefore constitutes deliberate and willful infringement of ECI's copyrights under the Copyright Act of 1976.

180.    In light of the above, ECI is entitled to injunctive relief pursuant to 17 U.S.C. § 502 as well as its actual damages suffered as a result of the infringement and any profits of Plyler and Olshan that are attributable to the infringement and not taken into account in computing actual damages, pursuant to 17 U.S.C. § 504.

181.    As a result of Plyler's and Olshan's infringing activities, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. ECI seeks to recover such attorney's fees and costs under 17 U.S.C. § 505.

### Count 8: Breach of EULA (Plyler and Olshan)

182.    ECI adopts the preceding paragraphs as if fully set forth herein.

183.    Plyler's and Olshan's EULAs are binding contracts with ECI.  There was a meeting of the minds as between ECI and Plyler and between ECI and Olshan as to all material terms. Plyler and Olshan accepted the EULAs by digitally confirming their acceptance and by continuing

to use and access the Advantage software and by paying license fees required by the EULAs during the terms that they were in effect.

184.    ECI has substantially performed all of its obligations under the EULAs by, among other things, providing the Advantage software and updates for the Advantage software to Plyler and Olshan.

185.    Plyler and Olshan breached their EULAs by, among other things, altering and modifying the Advantage software and permitting a third party to access the Advantage software. Plyler and Olshan also breached their EULAs by continuing to use the Advantage software after terminating their licenses.  Plyer and Olshan's conduct constitute material breaches of the EULAs.

186.    ECI has been harmed by Plyler and Olshan's breaches of their EULAs that have, among other things, enabled them to continue to use the Advantage software without purchasing and paying for licenses from ECI.  ECI seeks all damages available at law, whether direct or indirect, special or consequential, including, but not limited to, its benefit of the bargain damages, lost profits, and all incidental and consequential damages reasonably foreseeable as a result of the breaches.

187.    Additionally, as a result of Plyler's and Olshan's breaches of the EULAs, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  ECI seeks to recover such attorney's fees and costs pursuant to the terms of the EULAs and Section 38.001 of the Texas Civil Practice and Remedies Code.

### Count 9: Breach of Settlement Agreement (Prosperity, Matatall, and Frazier)

188.    ECI adopts the preceding paragraphs as if fully set forth herein.

189.    ECI's settlement agreement with Prosperity, Matatall, and Frazier is a binding contract.  There was a meeting of the minds as between ECI, on one hand, and Prosperity, Matatall,

and Frazier, on the other hand, as to all material terms.  Prosperity, Matatall, and Frazier accepted the Settlement Agreement by signing the contract.

190.    ECI has substantially performed its obligations under the settlement agreement by, among other things dismissing the litigation that was pending at the time and by agreeing to compromise its rights pursuant to the terms of the settlement agreement.

191.    Prosperity, Matatall, and Frazier have breached their settlement agreement with ECI by, among other things, using ECI's Trade Secrets and accessing ECI's Advantage software. The conduct of Prosperity, Matatall, and Frazier constitute material breaches of the settlement agreement.

192.    ECI has been harmed by Prosperity's, Matatall's, and Frazier's actions because Prosperity, Matatall, and Frazier provided access to ECI's Advantage software to persons that have not paid for that access and misused and violated ECI's Trade Secrets as set forth herein.  ECI seeks all damages available at law, whether direct or indirect, special or consequential, including, but not limited to, its benefit of the bargain damages, lost profits, and all incidental and consequential damages reasonably foreseeable as a result of the breaches.

193.    Additionally, as a result of Prosperity's, Matatall's, and Frazier's breaches of the settlement agreement, ECI has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  ECI seeks to recover such attorney's fees and costs pursuant to the terms of the settlement agreement and Section 38.001 of the Texas Civil Practice and Remedies Code.

### Count 10: Conspiracy (All Defendants)

194.    ECI adopts the preceding paragraphs as if fully set forth herein.

195.    Defendants were members of a combination of two or more persons.

196.    Defendants had a meeting of the minds on the objective and/or course of action. By way of example only, Plyler's phone calls to Matatall and Prosperity's call on July 24, 2018, Olshan's email to Prosperity regarding the events of July 24, 2018, the logs of activity on Plyler's and Olshan's servers on July 24, 2018, and the testimony of Olshan's and Prosperity's corporate representatives, reveal that Defendants agreed to obtain access to the Advantage software without purchasing and paying for it and in violation of federal and state statutory and common law.

197.    Defendants have each committed unlawful, overt acts to further the objective and/or course of action.  By way of example only, on or about, July 24, 2018, Olshan sought Prosperity's assistance with circumventing the technological measures that effectively control access to the copyrighted Advantage software.  Upon information and belief, on or about July 24, 2018, Plyler sought Matatall's assistance and Matatall relayed that request to Prosperity.  Moreover, Baldridge, at Frazier's direction, used a stolen trade secret to circumvent the technological measures that effectively control access to the copyrighted Advantage software.

198.    ECI suffered damages as a proximate and direct result of Defendants' wrongful conduct.  By way of example only, ECI has been deprived of the license fees it should have received from Plyler and Olshan.

199.    Defendants' wrongful conduct was done maliciously, willfully, and intentionally, and ECI seeks exemplary damages from Defendants in an amount to be determined by the trier of fact taking into account, among other things, the net worth of each Defendant.

### Count 11: Fraud in the Inducement (Matatall)

200.    ECI adopts the preceding paragraphs as if fully set forth herein.

201.    ECI alleges that Plyler's only right to access and use the Advantage software was pursuant to the EULA and that Plyler does not own any source code for the Advantage software.

Alternatively, if the Court determines that ABC granted Plyler (or any other customer) a perpetual license for the Advantage software or sold source code for the Advantage software to Plyler (or any other customer), Matatall fraudulently induced ECI into entering into the APA.

202.    When he executed the APA, among other things, Matatall represented to ECI that the only outstanding customer license agreements for the Advantage software were like a sample license agreement attached to the APA, which provided only a limited, non-perpetual license to use the Advantage software.  He also represented and warranted the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.

203.    Those representations were false because ABC licensed the Advantage software to Plyler under a license agreement that was perpetual and/or sold source code for the Advantage software to Plyler.

204.    When Matatall made these representations, he knew the representations were false and/or Matatall made the representations recklessly, as positive assertions, and without knowledge of their truth.  Plyler has asserted that it bought a version of the source code for the Advantage software.  William Plyler, Plyler's corporate representative, testified that he had known Matatall for approximately thirty years and described Matatall as Plyler's point of contact for software issues.  He also explained that, prior to ECI's purchase of the Advantage software, Matatall had verbally granted Plyler a perpetual license to run the Advantage software.

205.    Matatall made the representations with the intent that ECI would act on them by entering into the APA.

206.    ECI justifiably relied upon the representations in entering into the APA.

207.    ECI has been harmed by Matatall's fraudulent inducement.  Under the APA ECI paid millions of dollars for ABC's assets in justifiable reliance upon the representations that the

Advantage software had only been licensed under limited licenses that were like the sample license and the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses. ECI would not have not entered into the APA under the same terms if it had known there was an outstanding perpetual license or Plyler owed a version of the source code. Moreover, ECI has incurred the costs of suing Plyler based, at least in part, on the understanding that customers, including Plyler, did not have perpetual licenses or own a version of the source code.

208.    ECI did not know of Matatall's fraudulent inducement until it filed the instant lawsuit and Plyler asserted it owned a version of the source code to the Advantage software and had a perpetual license agreement, which is substantively and materially different from the sample agreement attached to the APA. Specifically, ECI had no indication that Plyler might have a non-standard license until Plyler's counsel asserted in an August 15, 2018 letter that Plyler had purchased a version of the source code for the Advantage software in 2000 (a position William Plyler later abandoned at his deposition when he asserted that, rather, Plyler had a perpetual license).

209.    Even with the exercise of reasonable diligence ECI could not have discovered that Plyler had a different license agreement or owned a version of the source code. Plyler continued to pay ECI to use the Advantage software for approximately a decade after the APA was executed. Moreover, even when Plyler stopped paying ECI to use the Advantage software, ECI was not aware that Plyler was continuing to use Advantage software until July 2018. In short, until recently, Plyler was acting consistently with the fact that it had a standard license.

210.    The injury is objectively verifiable through the evidence that ABC granted Plyler a perpetual license and/or sold it a version of the source code for the Advantage software.

Additionally, the APA itself is evidence that the ECI paid millions of dollars to acquire asserts that Matatall represented were only subject to certain disclosed licenses and that Matatall represented were owed exclusively by the Sellers with the exception of the disclosed licenses.  The costs ECI has incurred in suing Plyler are also objectively verifiable.

211.    Additionally, ECI did not discover Matatall's fraudulent inducement until it filed the current suit and Plyler asserted it had a license agreement that was different than the sample agreement attached to the APA and/or owned a version of the source code because Matatall fraudulently concealed his fraudulent inducement of ECI.  Matatall concealed the fact of his misrepresentation by affirmatively stating the only licenses in the Advantage software were like the sample license and the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.

212.    Matatall had actual knowledge that he was fraudulently inducing ECI into entering the APA with inaccurate and untrue representations and warranties.

213.    Matatall was also under a duty to disclose that Plyler had a license that differed from the sample license and/or owned a version of the source code because he voluntarily disclosed partial information in the APA and because he made partial disclosures in the APA that conveyed a false impression.

214.    Matatall intentionally concealed the fact that Plyler had a license that differed from the sample license and/or owned a version of the source code because he knew his representations and warranties in the APA regarding outstanding licenses and ownership of intellectual property were false.

215.    ECI reasonably relied upon Matatall's misrepresentations and silence to its detriment by entering into the APA.  A reasonable person in ECI's position exercising reasonable

diligence would not have disbelieved Matatall's misrepresentations or questioned his silence about Plyler's rights related to the Advantage software.  Plyler continued to pay ECI to use the Advantage software for approximately a decade after the APA was executed.  Moreover, even when Plyler stopped paying ECI to use the Advantage software, ECI was not aware that Plyler was continuing to use Advantage software until July 2018.  In short, until recently, Plyler was acting consistently with the fact that it had a standard license.

216.   ECI suffered damages as a proximate and direct result of Matatall's wrongful conduct.  By way of example only, ECI paid millions of dollars based on the express representations regarding outstanding licenses and ownership interests in the intellectual property.

217.   Matatall's wrongful conduct was done maliciously, willfully, and intentionally, and ECI seeks exemplary damages from Matatall in an amount to be determined by the trier of fact taking into account, among other things, the net worth of Matatall.

218.   The punitive damages limits in Chapter 41 Texas Civil Practice and Remedies Code are inapplicable because Matatall knowingly and intentionally secured the execution of the APA by deception.

## Count 12: Breach of Representations and Warranties (Matatall)

219.   ECI adopts the preceding paragraphs as if fully set forth herein.

220.   Alternatively, if the Court determines that ABC granted Plyler a perpetual license for the Advantage software or sold Plyler a version of the source code for the Advantage software, Matatall breached representations and warranties he made in the APA.

221.   The APA is an enforceable agreement between ECI and Matatall.

222.   As part of the APA, Matatall represented and warranted that the only outstanding license agreements were like the sample license agreement attached to the APA.  He also

represented and warranted the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.

223.    Matatall breached the representations and warranties because, at the time he made his representations and warranties, Matatall knew Plyler had a perpetual license to use the Advantage software and/or owned a version of the source code for the Advantage software.

224.    ECI has been harmed by Matatall's breach of the APA's representations and warranties because, under the APA, ECI paid millions of dollars for ABC's assets based on the representations and warranties that the Advantage software had only been licensed under limited licenses that were like the sample license and the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.  ECI would not have not entered into the APA under the same terms if it had known there was an outstanding perpetual license or a version of the source code for the Advantage software had been sold.  Moreover, ECI has incurred the costs of suing Plyler based, at least in part, on the understanding that Plyler did not have a perpetual license or own a version of the source code for the Advantage software.

225.    ECI did not know of Matatall's breach of his representations and warranties until it filed the instant lawsuit and Plyler asserted it had a license agreement that was different than the sample agreement attached to the APA and/or had bought a version of the source code for the Advantage software.

226.    Even with the exercise of reasonable diligence ECI could not have discovered that Plyler had a different license agreement and/or had purchased a version of the source code for the Advantage software.  Plyler continued to pay ECI to use the Advantage software for approximately a decade after the APA was executed.  Moreover, even when Plyler stopped paying ECI to use the Advantage software, ECI was not aware that Plyler was continuing to use Advantage software

until July 2018.  In short, until recently, Plyler was acting consistently with the fact that it had a standard license.

227.    The injury is objectively verifiable through the evidence that Plyler had a perpetual license and/or that Plyler owned a version of the source code for the Advantage software. Additionally, the APA itself is evidence that the ECI paid millions of dollars to acquire assets that Matatall represented and warranted were only subject to certain disclosed licenses and the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.  The costs ECI has incurred in suing Plyler are also objectively verifiable.

228.    Additionally, ECI did not discover Matatall's breach of the representations and warranties until it filed the instant lawsuit and Plyler asserted it had a license agreement that was different than the sample agreement attached to the APA and/or owned a version of the source code because Matatall fraudulently concealed his breach of the representations and warranties in the APA.  Matatall concealed the fact of his breach by affirmatively stating the only licenses in the Advantage software were like the sample license and the Sellers were the exclusive owners of all rights in the intellectual property with the exception of the disclosed licenses.

229.    Matatall had actual knowledge that he was breaching his representations and warranties.  Matatall knew the representation and warranty regarding outstanding licenses and ownership interests of intellectual property were false when he made them because he was aware of Plyler's perpetual license and/or knew Plyler owned a version of the source code for the Advantage software.

230.    Matatall was also under a duty to disclose that Plyler had a license and/or ownership interest in a version of the source code that differed from the sample license because he voluntarily

disclosed partial information and because he made partial disclosures that conveyed a false impression.

231.    Matatall intentionally concealed the fact that Plyler had a license that differed from the sample license and/or owned a version of the source code because he knew his representations and warranties regarding outstanding licenses and ownership interests in the intellectual property were false when he made them.

232.    ECI reasonably relied upon Matatall's misrepresentations and silence to its detriment by entering into the APA.  A reasonable person in ECI's position exercising reasonable diligence would not have disbelieved Matatall's misrepresentations or questioned his silence about Plyler's rights in the Advantage software.  Plyler continued to pay ECI to use the Advantage software for approximately a decade after the APA was executed.  Moreover, even when Plyler stopped paying ECI to use the Advantage software, ECI was not aware that Plyler was continuing to use Advantage software until July 2018.  In short, until recently Plyler was acting consistently with the fact that it had a standard license.

## VI.    INJUNCTIVE RELIEF (All Defendants)

233.    ECI adopts the preceding paragraphs as if fully set forth herein.

234.    As explained above, the Court entered a temporary restraining order on August 13, 2018 and extended it on August 28, 2018.

235.    The Parties requested the entry of an Agreed Preliminary Injunction, and Prosperity, Olshan, and Plyler agreed to be bound by the same.  On September 12, 2018, the Court entered an Agreed Preliminary Injunction that required Plyler and Olshan each to certify it had been in compliance with the temporary restraining order since its entry and that its original certification remained true in all respects; enjoined Plyler and Olshan from reinstalling or using

the Advantage software for any purpose; and enjoined them from using or disclosing the AMP Code (referred to in the order as the "AMP Command") to a third-party in a manner inconsistent with the orders of the Court.  Moreover, the Court required Prosperity to certify that it did not possess, directly or indirectly, any copies of the Advantage software; enjoined Prosperity from using the AMP Code, for any reason whatsoever; enjoined Prosperity from disclosing the AMP Code to any third party in a manner inconsistent with the orders of the Court; enjoined Prosperity from directly or indirectly accessing, using, modifying, copying, or tampering with the Advantage Software for any purposes whatsoever and regardless of where located; enjoined Prosperity from directly or indirectly assisting, encouraging, or facilitating ECI's current or former customers or third parties in modifying, tampering with, or copying the Advantage Software for any purposes whatsoever.

236.    The Agreed Preliminary Injunction was supported by findings that ECI had a substantial likelihood of success on the merits on its claims against Plyler, Olshan, and Prosperity; that there was a substantial threat that unless the Court restrained the defendants that ECI would suffer immediate and irreparable injury for which there is no adequate remedy at law; that the threatened injury to ECI in the absence of a preliminary injunction outweighed the cost or threatened injury to the defendants if the Court issued the preliminary injunction; and that granting the preliminary injunction would not disserve the public's interest.

237.    By its own terms, the Agreed Preliminary Injunction remains in place and shall be in full force and effect until the entry of judgment in this matter or until further modified by the Court.

238.    ECI requests that the Court leave the Agreed Preliminary Injunction in place.

239.    Following trial, ECI seeks a permanent injunction pursuant to Federal Rule of Civil

Procedure 65, 17 U.S.C. § 1203, 17 U.S.C. § 502, 18 U.S.C. § 1836, and the common law.

240.    Specifically, ECI requests that the Court issue an order:

- that Plyler and Olshan be enjoined from using the Advantage software for any purpose whatsoever;

- that the Prosperity Defendants be enjoined from accessing, using, or tampering with the Advantage software for any purposes whatsoever whether located on Plyler's and Olshan's servers or elsewhere; and

- that the Prosperity Defendants be enjoined from assisting, encouraging, facilitating or otherwise supporting any of ECI's current or former customers or third parties in accessing, using, or tampering with the Advantage software for any purposes whatsoever.

- that the Prosperity Defendants be enjoined from selling or using the Prosperity ERP.

## VII.    RELIEF REQUESTED

WHEREFORE, ECI requests that this Court issue summons and demand Defendants to appear herein and, after exercising all appropriate process, grant ECI the following relief: (i) all actual, direct, consequential, special, exemplary, and statutory damages to which ECI is entitled, in an amount to be determined at trial; (ii) reasonable and necessary attorneys' fees and costs as supported by the evidence and causes of action pled herein; (iii) pre-judgment and post-judgment interest at the maximum rates permitted by law; (iv) all injunctive relief, whether by temporary restraining order, preliminary injunction, and/or a permanent injunction, to which ECI is entitled

and is outlined herein; and (v) all such other and further relief, whether at law or in equity, to which

ECI may be justly entitled.

Dated:  March 19, 2019.                                   Respectfully submitted,


                                                          */s/ Christopher M. LaVigne*
                                                          Christopher M. LaVigne
                                                             Texas Bar No. 24026984
                                                             lavignec@gtlaw.com
                                                          Brennwyn B. Romano
                                                             Texas Bar No. 24099028
                                                             romanob@gtlaw.com
                                                          **GREENBERG TRAURIG, LLP**
                                                          2200 Ross Avenue, Suite 5200
                                                          Dallas, Texas 75201
                                                          Telephone: (214) 665-3600
                                                          Facsimile: (214) 665-3601

                                                          Mary-Olga Lovett
                                                             State Bar No.  00789289
                                                             lovettm@gtlaw.com
                                                          Rene Trevino
                                                             State Bar No. 24051447
                                                             trevinor@gtlaw.com
                                                          **GREENBERG TRAURIG LLP**
                                                          1000 Louisiana, Suite 1700
                                                          Houston, Texas  77002
                                                          Telephone:  (713) 374-3500
                                                          Facsimile:    (713) 374-3505

                                                          Kurt A. Kappes
                                                             California Bar No. 146384
                                                             kappesk@gtlaw.com
                                                          **GREENBERG TRAURIG, LLP**
                                                          1201 K Street, Suite 1100
                                                          Sacramento, CA 95814
                                                          Telephone: (916) 442-1111
                                                          Facsimile: (916) 448-1709

                                                          **ATTORNEYS FOR PLAINTIFF**
                                                          **ECI SOFTWARE SOLUTIONS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing motion on all counsel of record via the Court's CM/ECF system on March 19, 2019.

*/s/ Christopher M. LaVigne*
Christopher M. LaVigne

Exhibit A

Registration Number

**TX 8-673-859**

Effective Date of Registration:
February 06, 2019

## Title

**Title of Work:** Advantage Software v.15.5.1.3 2014/04/01

## Completion/Publication

**Year of Completion:** 2014
**Date of 1st Publication:** April 01, 2014
**Nation of 1st Publication:** United States

## Author

- **Author:** Advantage Business Computer Systems, Inc.
  **Author Created:** computer program, revised computer programs
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** ECI Software Solutions, Inc.
4400 Aliance Gateway Freeway, Suite 154, Fort Worth, TX, 76177, United
States
**Transfer statement:** merger of author into claimant

## Limitation of copyright claim

**Material excluded from this claim:** computer program

**New material included in claim:** computer program, revised computer programs

## Certification

**Name:** Manuel Valcarcel
**Date:** February 06, 2019
**Applicant's Tracking Number:** 138572.016500

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

Acting United States Register of Copyrights and Director



**Copyright Office notes:**   Regarding publication: Note to CO states The exact date of publication is on or shortly after April 1, 2014.

Registration Number

# TX 8-673-529

**Effective Date of Registration:**
February 06, 2019

## Title

**Title of Work:** Advantage Software v.11.0 2007/06/09

## Completion/Publication

**Year of Completion:** 2007
**Date of 1st Publication:** June 09, 2007
**Nation of 1st Publication:** United States

## Author

- **Author:** Advantage Business Computer Systems, Inc.
**Author Created:** computer program, revised computer program
**Work made for hire:** Yes
**Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** ECI Software Solutions, Inc.
4400 Alliance Gateway Freeway, Suite 154, Fort Worth, TX, 76177, United States
**Transfer statement:** merger of author into claimant

## Limitation of copyright claim

**Material excluded from this claim:** computer program

**New material included in claim:** computer program, revised computer program

## Certification

**Name:** Manuel Valcarcel
**Date:** February 06, 2019
**Applicant's Tracking Number:** 138572.016500

Acting United States Register of Copyrights and Director

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

Certificate of Registration

**Correspondence:** Yes
**Copyright Office notes:** Regarding publication: Notes to C.O. states "The exact date of publication is on or shortly after June 9, 2007."

Registration Number

# TX 8-673-521

Effective Date of Registration:
February 06, 2019

## Title

**Title of Work:** Advantage Software v.15.5.1.26 2018/07/05

## Completion/Publication

**Year of Completion:** 2018
**Date of 1st Publication:** July 05, 2018
**Nation of 1st Publication:** United States

## Author

- **Author:** ECI Software Solutions, Inc.
  **Author Created:** computer program, revised computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** ECI Software Solutions, Inc.
4400 Alliance Gateway Freeway, Suite 154, Fort Worth, TX, 76177, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program

**New material included in claim:** computer program, revised computer program

## Certification

**Name:** Manuel Valcarcel
**Date:** February 06, 2019
**Applicant's Tracking Number:** 138572.016500

Acting United States Register of Copyrights and Director

This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

**Correspondence:** Yes

Certificate of Registration



**Copyright Office notes:**   Regarding publication: Notes to C.O. states "The exact date of publication is on or shortly after July 5, 2018."